**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| DEMETRIUS THOMAS, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF SAINT LOUIS, MISSOURI, | ) |
| LT. COL. LAWRENCE O'TOOLE, | ) |
| CHARLENE DEEKEN, COL. GERALD | ) |
| LEYSHOCK, MJR. DANIEL HOWARD, | ) |
| LT. SCOTT BOYHER, LT. TIMOTHY | ) |
| SACHS, SGT. RANDY JEMERSON, | ) |
| SGT. MATTHEW KARNOWSKI, | )   Cause No.: 4:18-cv-01566-JAR |
| SGT. BRIAN ROSSOMANNO, | ) |
| LT. KIMBERLY ALLEN, LT. SCOTT | )   JURY TRIAL DEMANDED |
| AUBUCHON, LT. DANIEL CHITWOOD, | ) |
| LT. BILL KIPHART, LT. JAMES JOYNER, | ) |
| LT. CHRISTI MARKS, LT. MICHAEL | ) |
|  MAYO, LT. DONNELL MOORE, LT. PAUL | ) |
| PIATCHEK, SGT. ERIC BARTLETT, | ) |
| SGT. RONALD BERGMANN, | ) |
| SGT. MICHAEL BINZ, SGT. JAMES | ) |
| BUCKERIDGE, SGT. CURTIS BURGDORF, | ) |
| SGT. JOE CARRETERO, SGT. ANTHONY | ) |
| CARUSO, SGT. JAMES CLARK, SGT. | ) |
| DARNELL DANDRIDGE, SGT. ADAM | ) |
| DUKE, SGT. KELLY FISHER, SGT. BRANDT | ) |
| FLOWERS, SGT. SAMUEL GILMAN, | ) |
| SGT. PATRICK HAUG, SGT. JOHN JONES, | ) |
| SGT. MATTHEW KARNOWSKI, | ) |
| SGT. ROBERT LAMMERT, SGT. JOE | ) |
| LANKFORD, SGT. ROBERT LASCHOBER, | ) |
| SGT. TOM LONG, SGT. KYLE MACK, | ) |
| SGT. MIKE MANDLE, SGT. MICHAEL | ) |
| MARKS, SGT. MARK MCMURRY, | ) |
| SGT. JAMES MURPHY, SGT. DENNIS | ) |
| NEAL, SGT. PATRICIA NIJKAMP, | ) |
| SGT. KENNETH NIZICK, SGT. DONALD | ) |
| RE, SGT. BRADLEY ROY, SGT. DANIEL | ) |
| SCHULTE, SGT. MICHAEL SCEGO, | ) |
| SGT. TIMOTHY SCHUMANN SGT. BRIAN | ) |
| SEPPI, SGT. STEPHEN SLAMA, SGT. CLIFF | ) |

SOMMER, SGT. TIMOTHY TURNER,          )
SGT. SCOTT VALENTINE, SGT. CHARLES    )
WALL, SGT. DONNELL WALTERS,           )
SGT. SCOTT WEIDLER, SGT. CAROLYN      )
WIENER, SGT. ANTHONY WOZNIAK,         )
OFC. TRENTON LEE, OFC. BRIAN          )
LEMONS, OFC. JOSEPH RODRIGUEZ,        )
OFC. TIMOTHY MCNAMARA,                )
OFC. PATRICK DAUT, and OFC.           )
NICHOLAS LEE                          )
                                      )
        Defendants.                   )

## THIRD AMENDED COMPLAINT

Plaintiff files this Third Amended Complaint. On September 17, 2017, officers from the St. Louis Metropolitan Police Department ("SLMPD") illegally seized and subjected Plaintiff to violence without probable cause and in contravention of the U.S. Constitution and Missouri law. Defendant Officers either directly violated Plaintiff's civil rights or conspired to do the same. Defendant Officers[1] unlawfully seized, battered, arrested, prosecuted, and inflicted emotional distress and physical harm on Plaintiff and/or conspired to do the same.

The acts were planned, implemented, and directed by the Saint Louis Metropolitan Police Department, the acting Chief of Police, Defendants Leyshock, Sachs, Rossomanno, Jemerson, and other supervisors. Before the protests on the night in question, Defendants made plans to terrorize protesters. The plan was not designed to keep the peace, to serve the common good, or to protect citizens. It was designed to deter free speech and assembly. It was motivated by anger at the protesters and their message. It was, from the time it was conceived, and each time it was ratified during the events and after, a violation of clearly established constitutional law, including the First and Fourth Amendment.

---

[1] The term "Defendant Officers" means those officers identified in Paragraphs 12-19, below, including the Supervisor Officers, as defined in Paragraph 17.

Defendant Officers intentionally concealed their identities using military-like tactical dress and masks, making it exceedingly difficult to identify which Defendant Officer arrested, beat and/or used chemical munitions on each individual Plaintiff. Even if specific individual Defendant Officers cannot be identified, it is unquestionable that all Defendant Officers acted in concert to deprive Plaintiffs of their constitutional rights and to inflict terror on each and every one of them, as described below. It is equally clear that the kettling required planning and approval by the Saint Louis Metropolitan Police Department, including the acting Chief of Police. The events were a concerted, ratified plan that was not even arguably carried out within the bounds of state law or constitutional law.

## JURISDICTION AND VENUE

1.      This claim is brought pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated as against States and their municipal divisions through the Fourteenth Amendment.

2.      The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

3.      Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

4.      Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

5.     This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

6.     Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.     Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first-class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

8.     The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

9.     The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

10.     Lawrence O'Toole was employed as a Lt. Colonel with the SLMPD during the events of September 17, 2017, as detailed in this Complaint. On that date, he was the acting Chief of Police and, along with Defendant Charlene Deeken, was responsible for all management and direction of the SLMPD. Defendant O'Toole knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant O'Toole is a department head and is covered by Article VIII, Section 5 of the Charter of the City of St. Louis. Defendant O'Toole is sued in his individual capacity.

11.      Charlene Deeken was employed as the Director of Public Safety for the City of St. Louis during the events of September 17, 2017. SLMPD is a subdivision of the St. Louis Department of Public Safety. As such, she was the direct supervisor of Defendant O'Toole. On September 17, 2017, Defendant Deeken and Defendant O'Toole were responsible for all

management and direction of the SLMPD. Defendant Deeken is a department head and is covered by Article VIII, Section 5 of the Charter of the City of St. Louis. Defendant Deeken is sued in her individual capacity.

12.    Gerald Leyshock is employed as a police officer with the SLMPD. Defendant Leyshock has the rank of lieutenant colonel. Defendant Leyshock was the incident commander during the events of September 17, 2017. Defendant Leyshock knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Leyshock is sued in his individual capacity.

13.    Timothy Sachs was employed as a police officer with the SLMPD. Defendant Sachs had the rank of lieutenant. Defendant Sachs was on the ground supervising SLMPD officers during the events of September 17, 2017. He ordered the use of chemical agents and brought SLMPD's Civil Disobedience Team to the scene of the mass arrest. Defendant Sachs knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Sachs is sued in his individual capacity.

14.    Daniel Howard is employed as a police officer with the SLMPD. Defendant Howard has the rank of major. On the night of the incident, he was commander of the South Patrol. Howard was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Howard also assisted Leyshock with planning the kettling event. Defendant Howard knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Howard is sued in his individual capacity.

15.    Randy Jemerson is employed as a police officer with the SLMPD. Defendant Jemerson has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team,

a team tasked with handling protests and incidents of civil unrest. Defendant Jemerson was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Jemerson knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Jemerson is sued in his individual capacity.

16.     Brian Rossomanno was employed as a police officer with the SLMPD. Defendant Rossomanno had the rank of sergeant. He was a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Defendant Rossomanno was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Rossomanno knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Rossomanno is sued in his individual capacity.

17.     Defendants Lieutenant Kimberly Allen, Lieutenant Scott Aubuchon, Lieutenant Scott Boyher, Lieutenant Daniel Chitwood, Lieutenant James Joyner, Lieutenant Christi Marks, Lieutenant Michael Mayo, Lieutenant Donnell Moore, Lieutenant Paul Piatchek, Sergeant Eric Bartlett, Sergeant Ronald Bergmann, Sergeant Michael Binz, Sergeant James Buckeridge, Sergeant Curtis Burgdorf, Sergeant Joe Carretero, Sergeant Anthony Caruso, Sergeant James Clark, Sergeant Darnell Dandridge, Sergeant Adam Duke, Sergeant Kelly Fisher, Sergeant Brandt Flowers, Sergeant Samuel Gilman, Sergeant Patrick Haug, Sergeant John Jones, Sergeant Matthew Karnowski, Sergeant Robert Lammert, Sergeant Joe Lankford, Sergeant Robert Laschober, Sergeant Tom Long, Sergeant Kyle Mack, Sergeant Mike Mandle, Sergeant Michael Marks, Sergeant Mark McMurry, Sergeant James Murphy, Sergeant Dennis Neal, Sergeant Patricia Nijkamp, Sergeant Kenneth Nizick, Sergeant Donald Re, Sergeant Bradley Roy, Sergeant Daniel

Schulte, Sergeant Michael Scego, Sergeant Timothy Schumann Sergeant Brian Seppi, Sergeant Stephen Slama, Sergeant Cliff Sommer, Sergeant Timothy Turner, Sergeant Scott Valentine, Sergeant Charles Wall, Sergeant Donnell Walters, Sergeant Scott Weidler, Sergeant Carolyn Wiener, and Sergeant Anthony Wozniak ("Supervisor Officers") were employed as senior officers with the SLMPD during the events of September 17, 2017, as detailed in this Complaint. According to the City's own documents, Supervisor Officers supervised SLMPD Officers during the events in question, directed the police officers in their command to arrest the persons at the intersection of Washington and Tucker, and knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. These Defendants are sued in their individual capacities.

18.     Defendants Trenton Lee, Brian Lemons, Joseph Rodriguez, Timothy McNamara, Patrick Daut, and Nicholas Lee are employed as police officers with the SLMPD. Defendants Trenton Lee, Lemons, Rodriguez, McNamara, Daut, and Nicholas Lee knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendants Trenton Lee, Lemons, Rodriguez, McNamara, Daut, and Nicholas Lee are sued in their individual capacities.

19.     There are other unidentified SLMPD officers who have not been named as defendants in this litigation who contributed to, and/or participated in, the conduct described herein.  These unnamed officers prevented Plaintiff from leaving the area, and unlawfully arrested Plaintiff. Plaintiff has been unable to identify these officers because some of the officers removed their name tags from their uniforms in violation of guidance promulgated by the U.S. Department of Justice and standard law enforcement practices. Further, the officers wore masks concealing their faces. In violation of its policies, the City of St. Louis and SLMPD failed to properly

54

document the arrests and the various use of force against Plaintiff and other persons arrested that evening. The City of St. Louis and SLMPD also failed to conduct an adequate investigation into the identity of the officers who were involved in the kettling incident. To this day, the City cannot identify every officer involved in the incident. But for the actions of the individual officers, the SLMPD, and the City of St. Louis, these officers could have been identified. Additionally, unidentified officers described below knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

20.     Demetrius Thomas is resident of Belleville, Illinois who often works as an independent journalist in St. Louis.

## **FACTS**

### A.      **Backdrop of Stockley Verdict**

21.     On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Court Judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith.

22.     Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

23.     In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

24.     This is in stark contrast to SLMPD's appearance at a multitude of other un-permitted protests where the police themselves are not the target of the protest, including an anti-Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017,

54

the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

25.     The vast majority of protestors and protestor activity were non-violent and confined to peaceful marching and chanting.

26.     During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest activity, including the following:

a.     The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

b.     The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

c.     The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

d.     The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

e.     The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

f.     The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

g.     The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

h.     The evening of Friday, September 15, 2017, on Hortense Place.

54

i.      The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

j.      The evening of September 29, 2017 outside of Busch Stadium.

27.     These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents without warning.

## C.      Post-Ferguson Federal Court Proceedings

28.     In October 2014, SLMPD fired chemical agents at protestors on South Grand.

29.     In November 2014, SLMPD officers fired chemical agents at protestors on South Grand as well as into a business where peaceful protestors had congregated. SLMPD officers refused to allow the protestors to leave.

30.     On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

(1)     utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis

        (a)     without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
        (b)     without providing the individuals sufficient opportunity to heed the warnings and exit the area;
        (c)     without minimizing the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
        (d)     without ensuring that there is a means of safe egress from the area that is available to the individuals; and

(2)     utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

*See* Temporary Restraining Order, *Templeton v. Dotson*, 2015 WL 13650910, No. 4:14-cv-02019

at *3 (E.D. Mo. Dec. 11, 2014).

31.     This suit was in response to SLMPD firing chemical agents into a business where

peaceful protestors had congregated without allowing the protestors to leave.

32.     The City entered into a settlement agreement on March 25, 2015, where it agreed

as follows:

A.     Defendants and their agents, servants, employees, and representatives, will
not enforce any rule, policy, or practice that grants law enforcement officials the authority
or discretion to:
       (1)     utilize tear gas, inert smoke, pepper gas, or other chemical agents
(collectively, "chemical agents") for the purpose of dispersing groups of
individuals who are engaged in non-criminal activity:

           (a)     without first issuing clear and unambiguous warnings that
such chemical agents will be utilized;
           (b)     without providing the individuals sufficient opportunity to
heed the warnings and exit the area;
           (c)     without reasonably attempting to minimize the impact of
such chemical agents on individuals who are complying with lawful law
enforcement commands; and
           (d)     without ensuring that there is a means of safe egress from the
area that is available to the individuals and announcing this means of egress
to the group of individuals.

       (2)     utilize chemical agents on individuals engaged in non-criminal
activity for the purpose of frightening them or punishing them for exercising their
constitutional rights.

B.     Provided, however, that Paragraph A hereof shall not be applicable to
situations that turn violent and persons at the scene present an imminent threat of bodily
harm to persons or damage to property, and when law enforcement officials must defend
themselves or other persons or property against such imminent threat.

*See* Settlement Agreement, *Templeton v. Dotson*, 2015 WL 13650910, No. 4:14-cv-02019 at *1-

2 (E.D. Mo. Mar. 25, 2015).

### D.      SLMPD Violations of the Consent Decree

33.      Less than two months after entering into this Consent Decree, SLMPD began to violate the Decree.

34.      On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge another SLMPD officer for killing another African-American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning.

35.      On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. Sarah Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns.

36.      On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents.

37.      Defendants' action in the instant matter follows the same script whereby SLMPD officers violate the Constitutional rights of people expressing their First Amendment right to

protest against the police. Defendants' pattern and practice of illegally arresting and using chemical munitions against peaceful citizens is not only well documented but is detailed in *Ahmad* and *Templeton.*

### E.      The Buildup to the Kettling on September 17, 2017

38.     This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 17, 2017.

39.     According to testimony Defendant Rossomanno gave in federal court, on September 17, 2017, between 8:00 PM and 9:00 PM, a handful of individuals broke windows and destroyed flowerpots on the 900, 1000, and 1100 blocks of Olive Street in downtown St. Louis.

40.     At the time of this incident, the SLMPD arrested numerous individuals for his vandalism.

41.     There is no evidence nor allegations that Plaintiff was in any way involved in this destruction of property.

42.     Plaintiff is not aware of any evidence that any person arrested during the kettle was in any way involved in the destruction of property.

43.     Defendant Leyshock was the incident commander directing all of the supervisors including the other named Defendants.

44.     Defendant Sachs was in direct command of the officers in tactical gear.

45.     At approximately 8:48 PM the small number of protestors present at the time were ordered to disperse and could "be subject to arrest and/or chemical munitions."

46.     A second dispersal order was given at 8:51 PM.

54

47.     Defendants Rossomanno and Jemerson directed people to the intersection of Washington and Tucker, where the Defendants had already decided that they would kettle, pepper spray, beat, and illegally arrest Plaintiff.

48.     These dispersal orders could not be heard or understood by other police officers, let alone civilians in the area. In testimony given later in federal court, Defendant Sachs testified that he heard some sort of order being given, but that he could not make out "exactly what was being said."

### F.     The Kettling

49.     Over the next two plus hours, SLMPD officers began blocking roads and directing civilians to the intersection of Washington Avenue and Tucker Boulevard.

50.     Defendant Karnowski and the officers under his command began to "push (the protestors) north" toward Washington Avenue and Tucker Boulevard. He also testified that he determined that the protest that evening was an "unlawful assembly."

51.     This area is home to many condominiums, apartment buildings, and businesses, including restaurants and bars.

52.     Defendant Sachs came up with the plan to arrest everyone present. He presented his plan to Defendant Leyshock, who approved the plan. The plan was to not let anyone leave that was in the vicinity of Washington Avenue and Tucker Boulevard.

53.     Defendants Leyshock, Sachs, Rossomanno, and Jemerson knew or should have known that their plan to kettle the people that SLMPD directed to the intersection of Washington and Tucker and arrest them, merely for being present, would result in arrests without probable cause and the unjustified use of force to effectuate said arrests.

54.     At approximately 11:15 PM or 11:20 PM, SLMPD officers began forming into lines.

55.     This was nearly three hours after the windows and flowerpots were broken and many blocks away from the damaged businesses.

56.     SLMPD's Civil Disobedience Team appeared at the scene.

57.     According to the Civil Disobedience Response Operations Plan created by the SLMPD, the Civil Disobedience Team was broken down into South, Central and North Patrols, each further broken down into Alpha, Bravo, Charlie, Delta squads and arrest teams ("CDT Squads").

58.     In addition to the CDT Squads, officers from the Bicycle Response Team, Mobile Reserve - SWAT and Special Operations Unit actively participated in the kettling, arrest, and use of force on Plaintiff and other citizens at the corner of Tucker and Washington.

59.     As identified in the Civil Disobedience Response Operations Plan, the police report of the incident, and the videos taken by the City, each Supervisor Officer is a supervisor of one of the participating CDT Squads, Bicycle Response Team, Special Operations team or Mobile Reserve – SWAT team.

60.     The Supervisor Officers were an integral part of the kettling and subsequent use of excessive force because they directed their subordinates to participate in the kettle and unlawfully seize Plaintiff and the other citizens arrested that night.

61.     A line of officers extended across all of the street and sidewalk on Washington Avenue one block west of Tucker Boulevard.

62.     A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block north of Washington Avenue.

63.     A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block south of Washington Avenue.

64.     All three of these lines were comprised of officers all wearing military-like tactical dress, including helmets. These officers were carrying long wooden batons and full-body riot shields.

65.     A fourth line of extended across all of the street and sidewalk on Washington Avenue one half block east of Tucker Boulevard.

66.     Each of the four lines began to approach the intersection of Washington Avenue and Tucker Boulevard.

67.     Without further instruction or warning, SLMPD officers surrounded Downtown residents, business patrons, protestors, observers, and members of the press, cutting off all routes of egress - including via any sidewalk - and prohibiting the people trapped inside from leaving.

68.     As they approached, the SLMPD police officers began banging batons against their riot shields and the street in unison causing a foreboding and terrifying sound, akin to a war march.

69.     As the SLMPD police officers began to close in on the citizens that SLMPD had forced into the intersection of Washington Avenue and Tucker Boulevard, the officers blocked anyone from leaving the area.

70.     Multiple citizens approached officers and requesting to be let past. These peaceful and lawful requests were not only ignored but responded to by screams of "get back!"

71.     In addition, the closing phalanxes of officers cut off access to all alleys and other means of egress.

72.     As the four lines closed, they trapped everyone who was within a one-block radius of the intersection of Washington Avenue and Tucker Boulevard.

73.     This is a law enforcement tactic known as "kettling."

74.     The SLMPD police officers kettled a wide variety of innocent citizens, including self-admitted protestors, residents who merely lived in the area, people visiting businesses in the area, reporters, documentarians, and homeless persons.

75.     The officers even grabbed an African-American male who was outside of the kettle and threw him into the kettle.

76.     As the kettle closed, many individuals approached the officers and begged to pass.

77.     Not surprisingly, the individuals in the kettle gravitated toward the line of bicycle officers rather than three lines of police in military gear, who were banging wooden batons against their riot shields.

78.     Individuals peacefully approached the bicycle officers with their hands up.

79.     In response, the bicycle officers began to aggressively jab at the individuals using their bicycles as battering rams.

80.     The Supervisor Officers were directing these officers.

81.     Rather than defuse the situation, many of the Supervisor Officers directed the officers under their command to use force against the peacefully assembled people and supervised the unlawful arrests. The other Supervisor Officers made no attempt to stop the illegal use of force and the unlawful arrests.

82.     Some Supervisor Officers, including Defendants Karnowski, Aubuchon, and Kiphart, actively engaged in the use of excessive force by arbitrarily and unconstitutionally pepper spraying peaceful citizens who were in compliance with police orders, to the extent they were even given. Their actions caused Plaintiff to experience chaos, fear and terror.

83.     Those other Supervisor Officers that did not actually deploy pepper spray or put their hands on citizens still stood and watched as others did use excessive force and failed to intervene despite having the authority and opportunity to do so.

84.     Some of the Supervisor Officers, including Defendants Aubuchon, Kiphart, and Karnowski, actively engaged in the unconstitutional use of pepper spray on innocent civilians. The others stood by and watched as civilians, including Plaintiff, were unconstitutionally arrested, beaten, pepper-sprayed, and failed to intervene in the violation of Plaintiff's civil rights.

85.     At the very beginning of the kettle, a few people caught in the crowd peacefully stood with their hands up in front of the line of officers, trying to understand what was happening. Defendant Karnowski instigated the violent attacks against the innocent citizens when he unleashed pepper spray against several citizens who were peacefully standing still with their hands up. At no time was Defendant Karnowski in any danger as he was safely standing with a line of bicycle officers between him and the citizens. All of his illegal actions were documented on a video camera strapped to his helmet.

86.     Almost immediately after, Defendant Aubuchon followed suit and indiscriminately sprayed numerous innocent civilians.

87.     The use of excessive force at the outset of the arrest by a lieutenant and sergeant was tacit approval to the other officers to engage in the same unconstitutional behavior. Their behavior resulted in a domino effect of excessive force and unconstitutional behavior on Plaintiff and the others arrested that evening.

88.     Almost instantly and in unison, the other individuals in the kettle put their hands in the air as a sign of peaceful surrender.

89.     Many laid prostrate on the ground. Others sat down. And others, who could not fully get to the ground because of the mass of people inside of the kettle, got as close to the ground as possible.

90.     Even though video evidence shows that none of the individuals inside the kettle were acting violently or aggressively, the individuals in the kettle were indiscriminately and repeatedly doused with chemical agents without warning.

91.     One of the Supervisor Officers, Defendant Kiphart, viciously attacked a journalist with a camera with pepper spray from a "fogger" which also sprayed indiscriminately into the crowd. Moments later, Detective Matthew Burle deployed another fogger blast towards the same journalist and those sitting near him with more pepper spray in the face, yet another concrete example of a subordinate officer taking a cue from a Supervisor Officer to engage in unconstitutional excessive force.

92.     Many of the persons arrested were kicked, beaten, and dragged.

93.     Some individuals caught in the kettle had been wearing goggles because they feared the deployment of chemical agents, based on the SLMPD's well known pattern and practice of using chemical agents against peaceful protestors.

94.     Others found paper masks on the ground or other objects in order to protect themselves as it became apparent that SLMPD was preparing to effectuate illegal and likely violent arrests.

95.     In response, SLMPD officers roughly removed the goggles of some individuals and then sprayed them directly in the face.

96.     At the same time, SLMPD officers screamed derogatory and homophobic epithets at individuals as they were being arrested.

97.     These punitive measures were delivered without regard to the fact that the individuals were peaceful and compliant.

98.     Defendants Jemerson, Rossomanno, and the Supervisor Officers were within arms-length of SLMPD officers who were pepper spraying and beating peaceful and compliant citizens. Rather than instructing these officers to cease violating the civil right of the citizens, these Defendants took control of the situation and directed the officers' unlawful actions.

99.     SLMPD officers used hard plastic zip ties to arrest all of the individuals. Over two months later, several continue to suffer from pain and numbness in their hands due to the tightness of the zip ties.

100.    Over 100 people were arrested that night.

101.    During and after the arrests, SLMPD officers were observed high fiving each other, smoking celebratory cigars, taking selfies on their personal phones with arrestees against the arrestees will, and chanting "Whose Streets? Our Streets!"

102.    That evening, the following celebratory picture was posted on Twitter by an anonymous person:



54

103.     By the coordinated actions of the officers in circling the assembly into the kettle and the systematic disbursement of the chemical agents, it is clear that these tactics were planned and that senior officials of the SLMPD not only had notice of but actually sanctioned the conduct of Defendants.

104.     Defendants' actions did not occur randomly. Rather, Defendants decided beforehand that they would make an example of the arrestees in an attempt to scare other citizens from exercising their First Amendment rights to protest against the SLMPD's actions.

105.     SLMPD officers specifically hid their identity from observers and citizen arrestees including Plaintiff by obscuring their identities the night of the incident, and by intentionally failing to record which officers seized or interacted with which arrestee. The officers hid their identity in order to scare and intimidate observers, terrorize the citizen arrestees, avoid any department accountability, avoid any civil or criminal legal responsibility, and to help fellow officers avoid identifying wrongdoers following the incidents.

106.     The next day, the SLMPD Acting Chief reinforced the City's ratification of the Defendants' actions when he said, "I'm proud to say the city of St. Louis and the police owned the night," while standing next to Saint Louis Mayor Lyda Krewson.

107.     The day after the arrests, Mayor Krewson further validated the illegal actions of Defendants when she thanked the officers "for the outstanding job they have been doing over the last three days." She added that she fully supported the actions of the officers.

108.     Since then, the U.S. Attorney's Office brought indictments in federal court against 5 SLMPD Officers on the Civil Disobedience Team for the beating of an undercover police officer on September 17, 2017. Emails quoted in the indictment show that the officers were informed ahead of time that they would be deployed wearing military-like tactical dress to conceal their

identities in order to beat protestors. This is exactly what occurred to Plaintiff, under the direct supervision and control of Defendants Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno.

109.    The indictment quoted text messages sent to and from the defendant officers regarding the mass arrest on September 17, 2017, that prove the vicious and unlawful intent of the officers and belie any post hoc justification for the kettling, use of chemical agents, excessive force, and arrests:

    a.   "The more the merrier!!! It's gonna get IGNORANT tonight!! But it's gonna be a of lot of fun beating the hell out of these shitheads once the sun goes down and nobody can tell us apart!!!!"

    b.   "R u guys in [South Patrol Division] prepping anything for the war tonight?"

    c.   "We reloading these fools up on prisoner busses. As they got on we all said in unison 'OUR STREETS' haha."

    d.   "Yeah. A lot of cops gettin hurt, but it's still a blast beating people that deserve it. And I'm not one of the people hurt, so I'm still enjoying each night."

    e.   "The problem is when they start acting like fools, we start beating the shit out of everyone on the street after we give two warnings."

    f.   "I'm on (Sgt **'s) arrest team! Me and a BIG OL black dude r the guys that are hands on! No stick or shield… just (expletive) people up when they don't act right! …"

### G.    The Police Department Intentionally Ignored Its Own Policies

110.    When detaining individuals in custody who require medical care, the City of St. Louis and its SLMPD has established the following policy:

## PRISONERS REQUIRING MEDICAL ATTENTION (72.6.1)

1. A medical emergency is defined as a condition which a reasonable person would expect a result in loss of life or function. Examples of medical emergencies include severe bleeding, fractures with displacement (bone out of alignment), loss of consciousness, non-responsiveness, and respiratory distress, severe chest pain or severe shortness of breath. This list is not all-inclusive. If you have any doubts, contact the on-duty nurse at the City Justice Center for guidance.

2. Should a prisoner require <u>emergency</u> medical attention, whether the injury or illness occurred during incarceration or not, an Emergency Medical Service (EMS) unit will be requested to respond to the holdover for medical evaluation and if necessary conveyance to the hospital. EMS will determine the destination hospital. An I/LEADS report will be prepared documenting all treatment received by the prisoner. If immediate first aid is administered by a Department employee or the paramedics, the injury and treatment will be noted in the Prisoner's Log Book by the booking clerk.

3. Should a prisoner require <u>non-emergency</u> medical attention, the on-duty nurse at the City Justice Center will be contacted for guidance.

4. The confidential relationship of doctor and patient extends to prisoner patients and their physician.

5. In the event a prisoner is injured while in custody or shortly before being taken into custody, the Watch Commander will arrange to have photographs taken of any and all visible injuries. The photographs will be treated as physical evidence. If practical, the photos should be taken both prior to the application of bandages, etc., and after the injury has received appropriate medical attention

## PRISONER HEALTH SCREENING (72.6.3)

The following prisoner medical "receiving screening" information will be obtained and recorded on the Field Booking Form when prisoners are booked and verified upon their transfer to another facility or release:

1. Current health and medical history of the prisoner; (72.6.3.a)
2. Medication taken by the prisoner; (72.6.3.b)
3. Known medication/drug allergies;
4. Behavior, including state of consciousness and mental status; and (72.6.3.c)
5. Body deformities, trauma markings, bruises, lesions, jaundice (a yellowness of the skin and whites of the eyes), and ease of movement (72.6.3.d)

<u>NOTE:</u>  a copy of the Field Booking Form **must** be attached to the computerized Arrest Register whenever a prisoner is transferred to the City Justice Center.

111.    On information and belief, the SLMPD and City of St. Louis Correctional Staff failed and/or refused to follow this policy when they provided no medical care to any of the people illegally pepper sprayed.

112.    Defendants' decision to ignore the policy constitutes a custom and practice of failing and/or refusing to follow this policy designed to protect the safety and wellbeing of injured individuals in police custody, showing a deliberate indifference by Defendants to the rights of Plaintiff and other injured detainees.

113.    Despite this policy, at no time between their arrest and their release from the St. Louis City Justice Center did any police officer or other city official provide any arrestee with medical care or give anything to them to wash the chemical agents out of their eyes, off their bodies, or off their clothes.

### H.    Arrest and Charges of Kettling Victims

114.    Upon their release, all of the arrestees were given summonses showing that they had been charged with "failure to disperse." They were instructed to appear at St. Louis City Municipal Court on October 18, 2017.

115.    They were charged as such even though SLMPD officers provided no means of egress, denied repeated requests to be allowed to leave, and kettled the individuals.

116.    In at least one case, a person was thrown from outside of the kettle into the kettle by SLMPD and was subsequently arrested for failure to disperse.

117.    The press release stated "[m]any of the demonstrators were peaceful, however after dark, the agitators outnumbered the peaceful demonstrators and the unruly crowd became a mob. Multiple businesses also sustained property damage and one officer suffered a serious injury."

118.    Egregiously and in an attempt to further punish its victims, SLMPD publicly released the addresses of the arrestees.

119.    The video evidence, as the federal court observed, "shows no credible threat of force or violence to officers or property in this mixed commercial and residential area" – much less a mob. SLMPD also fails to mention that the "one officer who suffered a serious injury" was an undercover officer who was pepper sprayed and beaten by SLMPD.

120.    SLMPD used its Twitter account to disseminate this false statement to its approximately 70,000 followers. SLMPD subsequently deleted the tweet.

121.    During a preliminary injunction hearing, attorneys representing the City stated that it was the policy of the City of St. Louis that once property damage occurs, SLMPD is justified in declaring an unlawful assembly and then deploying chemical agents regardless of the proximity of the target individuals in time or space to the property damage and regardless of if the people were engaged in criminal activity. According to the City, officers are justified to use chemical agents or beat and arrest anybody merely for being close to the area, even hours after the criminal activity has occurred.

122.    On October 13, 2017, the St. Louis City Counselor's office issued a letter stating "[a]s of today, the City Counselor is still reviewing the evidence against you in order to decide whether or not to file charges and it is not anticipated that this decision will be made prior to October 18, 2017. Therefore, you are released from any obligation to appear in Municipal Court on October 18, 2017, in connection with the offense being considered. After a review of the matter is completed, should a decision be made to file charges against you, you will be notified by mail of that decision and advised when and where to appear to defend against those charges."

## I.      Federal Court Injunctive Relief

123.    On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Doc. 58, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

124.    The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests." *Id*. at 2.

125.    The Court found that on September 17, 2017, there was some property damage downtown but Defendant Sachs "testified that he was unaware of any property damage occurring in the downtown area after 8:30 PM". *Id*. at 9.

126.    The Court found that Defendant Rossomanno gave a dispersal order before 10:00 PM but that "this order did not specify how far protesters had to go to comply with the directive to leave the area." *Id*. at 8. The Court noted that Defendant Sachs "could not say 'exactly how far would be enough' to comply with this, or any, dispersal order." *Id*. at 8-9.

127.     The Court found that Defendant Sachs "testified that around 10:00 PM the decision was made to make a mass arrest of people remaining in the area of Tucker and Washington, which is three or four blocks away from where the earlier dispersal order was given." *Id.* at 9. Yet, SLMPD continued to "freely allowed people ingress into the area after the initial dispersal order was given." *Id.* at 11.

128.    The last known dispersal order was given approximately 45 minutes *before* the mass arrests began but approximately 45 *after* SLMPD made the decision to conduct a mass arrest.

This final dispersal order was once again given approximately two blocks south of the intersection of Washington and Tucker. The dispersal order[2] was "You are being ordered to disperse from the area of Locust and Tucker by walking north on Tucker or west on Locust." Rather than being a legitimate order, this was a trap. By complying with the order and moving north on Tucker as directed by police, the citizens were forced to the intersection of Washington and Tucker, which SLMPD had already designated as the mass arrest location. Even though the citizens complied with the order, they were arrested for failure to comply.

129.    The Court found that at approximately 11:30 PM SLMPD began a mass arrest of everyone in the vicinity even though video evidence presented to the Court "does not shows a large crowd congregating in the streets" and "[n]o violent activity by protesters can be observed on the video." *See* Doc. 58 at 10, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017). In fact, the "scene appears calm and most people appear relaxed." *Id.* at 10-11. The only signs of disobedience seen on the video are "four to five individuals" sitting on Tucker Avenue, which was closed, and a small group of people yelling at the police. *Id.* at 10.

130.    The video was taken from approximately 10:45 PM to the time of the arrests at 11:30 PM *Id.* at 12.

131.    The video "shows an unidentified officer walking around with a hand-held fogger shooting pepper spray at the arrestees, who all appear to be on the ground and complying with police commands. This officer issues no verbal commands to any arrestee, and no arrestee on the

---

[2] These dispersal orders were premised on SLMPD's determination that there was an "unlawful assembly." The *Ahmad* court determined that the SLMPD made that determination in contravention of the language of the statute and that the statute was overly broad. *See* Doc. 58, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

video appears to be resisting arrest. The video shows other officers shouting at people on the ground and making threatening gestures at them with mace. An unidentified (person) lying face down on the ground is picked up by his feet by two officers and dragged across the pavement." *Id.* at 15-16.

132.    In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id*. at 37. Not surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

133.    The Court made the following findings:

a.    Plaintiffs are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiffs. *Id.* at 35-36.

b.    Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights. *Id*. at 36.

c.    Plaintiffs' evidence of the activities in the Washington and Tucker intersection on September 17, 2017, **shows no credible threat of force or violence to officers or property in this mixed commercial and residential area**. *Id*. at 37. (Emphasis added).

d.    Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary

authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id*. at 37-38. Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of plaintiffs' constitutional rights. *Id*.

e.      Similarly, Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiffs' First and Fourth Amendment rights. *Id*. at 39.

f.      Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory. *Id*. at 40.

g.      Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police

or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 41.

      h.    Plaintiffs have presented sufficient, credible testimony and video evidence from numerous witnesses that they were maced without warning in the absence of exigent circumstances while they were not engaging in violent activity and either were not in defiance of police commands (because none were given) or were complying with those commands. *Id*. at 42.

      i.    The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id*. at 43-44.

      j.    Plaintiffs' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 44.

      k.    Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the

violations of plaintiff's constitutional rights. *Id.* at 44. That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id.* at 44-45.

134.    Upon information and belief, senior officials of the SLMPD, including Defendants Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno, were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

135.    At no point since the mass arrest in September 2017 has SLMPD Internal Affairs Division done an internal investigation of any kind into the numerous citizen complaints filed following the kettling.

## ALLEGATIONS (SPECIFIC)

136.    On the evening of September 17, 2017, Mr. Thomas received a phone call from a friend telling him about protests that were occurring downtown.

137.    Mr. Thomas headed downtown expecting to see large crowds gathering and marching. He brought two cameras and a drone to record any goings-on.

138.    However, by the time Mr. Thomas arrived downtown, all of the protests had ended. As Mr. Thomas drove around, he did not see any protestors.

139.    When he made it to Olive Street, near Tucker Street, police came out of nowhere and surrounded his vehicle.

140.    The large group of officers passed Mr. Thomas's car. Mr. Thomas decided to get out to record their actions.

141.    He gave his friend a second camera to record the officers' actions.

142.    Mr. Thomas and his friend walked on the sidewalk as they recorded the police.

143.    The first thing Mr. Thomas saw was SLMPD officers dressed in military-esque riot gear form a line and begin to chant loudly.

144.    Mr. Thomas changed his position, so he could get a better angle of the police.

145.    At this point, a police officer in a white shirt, who Mr. Thomas believed to be a supervisor, told Mr. Thomas that Mr. Thomas was permitted to record as long as he stayed on the sidewalk.

146.    Mr. Thomas immediately complied and joined other members of the media, including a person known as "RebZ" on a sidewalk corner.

147.    It should have been apparent to anyone that Mr. Thomas and the people he was gathered with were not protesting. Rather, they were exercising their constitutional rights to record law enforcement.

148.    Because he was with an easily identifiable group of media members, Mr. Thomas believed that he was safe. Sadly, he was wrong.

149.    Throughout the night, Mr. Thomas complied with the few directions that SLMPD officers gave him. When asked to move, he moved.

150.    Eventually, it became apparent to him that SLMPD officers were repositioning themselves to surround and kettle everyone present at the intersection of Washington Avenue and Tucker Boulevard.

151.    As the kettling began, Mr. Thomas did not observe anyone protesting or breaking any laws.

152.    Mr. Thomas then observed a large black SLMPD police truck. The truck was making some inaudible announcement. A review of Mr. Thomas's recording confirms that whatever was being announced was undecipherable.

153.    At this point, other than some chanting, the police were acting normal. They were smiling.

154.    All of sudden, the demeanor of the officers changed. The officers began to beat their batons against the ground and their shields.

155.    The civilians in the intersection grew concerned and asked the officers what they were doing. The officers did not respond.

156.    Mr. Thomas attempted to leave via an alley, but an SLMPD officer blocked his path.

157.    The officer was carrying a large baton and directed Mr. Thomas back to the intersection of Washington and Tucker.

158.     Mr. Thomas immediately complied.

159.    Upon returning to the intersection, Mr. Thomas saw between 100 to 200 officers. The officers were pounding their batons against their shields and the ground.

160.    Terrified, Mr. Thomas attempted to get to his car parked on Washington Avenue, just west of Tucker.

161.    Police prevented Mr. Thomas from getting in his car and leaving, even though Mr. Thomas was loudly pleading with them to be allowed to leave.

162.    In response to Mr. Thomas's pleas, an SLMPD officer pointed a large can of pepper spray at Mr. Thomas and told him to "get out of here." The officer directed Mr. Thomas back to the intersection of Washington and Tucker.

163.    Mr. Thomas complied. When he returned to the intersection, he encountered a large group of terrified people trying to leave the area.

164.    Mr. Thomas and the rest of the group tried to leave by going east of Washington Avenue.

165.    They were prevented from leaving by a phalanx of bike officers.

166.    Mr. Thomas quickly attempted to secure his $6,000 camera.

167.    Soon after, Mr. Thomas was knocked to the ground. He heard his friend yell "They are pushing us."

168.    Within seconds and without warning, SLMPD officers including Lieutenant Kiphart, Officer Burle, and Sergeant Long began to indiscriminately pepper spray the people that had been kettled.

169.    Mr. Thomas heard no instructions.

170.    Even though Mr. Thomas was on the ground and fully complaint, an unidentified officer grabbed Mr. Thomas by his arms, dragged him, and threw Mr. Thomas, to another spot in the intersection.

171.    Despite Mr. Thomas's full compliance, Defendants Samuel Gilman, Brian Lemons, Joseph Rodriguez, Timothy McNamara, Trenton Lee, and Patrick Daut, and Nicholas Lee grabbed Mr. Thomas by the arms and legs while one of them repeatedly beat Mr. Thomas in the ribs with a baton.

172.    The City identified Defendant Trenton Lee as Mr. Thomas's arresting officer.

173.    Defendants Samuel Gilman, Brian Lemons, Joseph Rodriguez, Timothy McNamara, Trenton Lee, and Patrick Daut, and Nicholas Lee confiscated Mr. Thomas's camera and broke Mr. Thomas's drone.

174.    Defendants Samuel Gilman, Brian Lemons, Joseph Rodriguez, Timothy McNamara, Trenton Lee, and Patrick Daut, and Nicholas Lee roughly, painfully zip tied Mr. Thomas's hands.

175.    Defendants Samuel Gilman, Brian Lemons, Joseph Rodriguez, Timothy McNamara, Trenton Lee, and Patrick Daut, and Nicholas Lee further terrorized Mr. Thomas by carrying him by each of his limbs, across the intersection, before returning him to his feet.

176.    Even after Defendants Samuel Gilman, Brian Lemons, Joseph Rodriguez, Timothy McNamara, Trenton Lee, and Patrick Daut, and Nicholas Lee zip tied Mr. Thomas, he did not believe he was going to be arrested, as he had done nothing wrong. Yet, Mr. Thomas spent at least 48 hours in jail.

## COUNT I
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations: Unreasonable Seizure
### (Against All Defendant Officers)

177.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

178.    Defendant Officers knew or should have known that SLMPD officers did not have probable cause to arrest Plaintiff.

179.    Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee, Daut, Nicholas Lee, and John Doe unreasonably seized Plaintiff, thereby depriving Plaintiff of Plaintiff's right to

be free from unreasonable seizure of Plaintiff's person in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

180.    Further, there was no objectively reasonable belief that Plaintiff had committed a criminal offense, nor was there even arguable probable cause for the arrest. As such, the seizure was unreasonable.

181.    Plaintiff was unreasonably seized when Defendant Officers, acting in concert, terminated Plaintiff's freedom of movement by use of kettling.

182.    Defendant Officers' use of kettling without providing warning to Plaintiff was an unreasonable seizure. As a direct result of the conduct of Defendants described herein, Plaintiff suffered physical injury and emotional trauma.

183.    Defendant Officers engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's Fourth Amendment rights.

184.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

185.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

186.    At all times, Defendant Officers were acting under color of state law.

187.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

<u>**COUNT II**</u>
**42 U.S.C. § 1983 – First and Fourteenth Amendment Violations**
**(Against All Defendant Officers)**

188.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

189.    Plaintiff has a fundamental right to assemble and express Plaintiff's views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

190.    Defendant Officers' actions violated Plaintiff's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public.

191.    Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

192.    Defendant Officers' actions violated Plaintiff's First Amendment rights to freedom of speech by interfering with Plaintiff's ability to gather information and cover a matter of public interest.

193.    Defendant Officers engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's First Amendment rights.

194.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear,

apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

195.    Additionally, Defendant Officers' actions described herein have had a chilling effect on Plaintiff, who is now less likely to participate in free public discourse.

196.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

197.    At all times, Defendant Officers were acting under color of state law.

198.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT III
### 42 U.S.C. § 1983 – Conspiracy to Deprive Civil Rights
### (Against All Defendant Officers and Defendant O'Toole)

199.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

200.    On September 17, 2017, Defendant Officers and Defendant O'Toole, acting in their individual capacities and under color of law, conspired together and with others, and reached a mutual understanding to undertake a course of conduct that violated Plaintiff's civil rights.

201.    As described above, Defendants Leyshock, Sachs, Jemerson, and Rossomanno conspired to design and implement the illegal kettling plan, with the intent to unlawfully arrest and use excessive force on Plaintiff. Defendant O'Toole was in charge of all SLMPD officers at all times relevant to this Complaint and supervised these four officers. Defendant O'Toole has

54

testified that Defendant Leyshock shared the kettling and arrest plan with Defendant O'Toole, and Defendant O'Toole did not raise any objections before Defendant Officers executed the plan.

202.    The Supervisor Officers joined the conspiracy when they directed officers under their control and supervision to execute the illegal kettling plan, with the intent to unlawfully arrest and use excessive force on Plaintiff.

203.    The other Defendant Officers joined the conspiracy when they agreed to participate in the illegal kettling plan and then unlawfully arrested and used excessive force on Plaintiff.

204.    The conspiracy was furthered by the following overt acts:

      a.    Defendant Officers, acting in concert, kettled and unlawfully seized Plaintiff. They detained Plaintiff in the City Justice Center for 12-24 hours.

      b.    Supervisor Officers directed their subordinates to kettle and unlawfully seize Plaintiff.

      c.    Defendant Officers, including but not limited to Defendants Karnowski, Aubuchon, Long, and Kiphart, began to arbitrarily and unconstitutionally pepper spray citizens who had complied with orders, causing chaos, fear and terror to Plaintiff.

      d.    Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee, Daut, Nicholas Lee, and John Doe used excessive force by restraining Plaintiff or tying Plaintiff's hands in the zip-cuffs.

      e.    An unidentified officer used excessive force by dragging Plaintiff.

      f.    Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee, Daut, Nicholas Lee, and John Doe used excessive force by beating Plaintiff.

      g.    Defendant Officers initiated charges against Plaintiff that would chill a person of ordinary firmness.

205.    As a direct and proximate result of the conspiracy between Defendant Officers, Defendant O'Toole, and others as described above, Plaintiff was subjected to assault; the use of excessive force; the deprivation of the right to be free from unreasonable search and seizure; and malicious prosecution.

206.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

207.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

208.    At all times, Defendant Officers and Defendant O'Toole were acting under color of state law.

209.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT IV

### 42 U.S.C. § 1983 – Municipal Liability
*Monell* **Claim against Defendant City of St. Louis for Failure to Train, Failure to Discipline, Failure to Supervise, and for a Custom of Conducting Unreasonable Search and Seizures and Use of Excessive Force**

210.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

211.     Defendant City is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for the other Defendants' violation of Plaintiff's rights because the violations were caused by a policy, practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices, or customs that caused constitutional harm to Plaintiff are the following:

a.     SLMPD officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested;

b.     SLMPD's custom or practice of refusing to provide medical care to citizens who are arrested, namely, refusing to treat those suffering from pepper spray and refusing to loosen or release dangerously tight zip cuffs and treat resulting injuries;

c.     SLMPD policy or custom of using kettling without warning on citizens who are not resisting arrest and who are exercising First Amendment rights, whether those rights be protesting or reporting;

d.     SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

e.     SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;

f.     SLMPD's policy, custom, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

212.     Further, Defendant City has inadequately trained, supervised, and disciplined SLMPD officers, with respect to its officers' use of kettling and use of force.

213.    Defendant City had notice that its use of force training and officer supervision was inadequate and likely to result in constitutional violations based on multiple incidents of excessive force against protestors in October 2014, November 2014, July 2015, August 2015, and September 2017.

214.    Even after Defendant City agreed to adopt a new policy on the use of chemical weapons in the March 2015 *Templeton* settlement, Defendant City failed to properly implement the policy, did not initiate or require sufficient retraining of its officers on this supposed policy, and allowed the officers to operate as they had before, as evidenced by the repeated constitutional violations perpetrated by SLMPD officers after that settlement and before the incident at issue in this case.

215.    Additionally, but without waiver of the foregoing, City officials failed to supervise, control, and/or discipline officers of the Department when they engaged in constitutional violations like those set forth above.

216.    SLMPD continues to rely on an Internal Affairs department that had been ineffective at curbing these unconstitutional behaviors, rather than adopt a process for the independent investigation and review of citizen complaints, evidences a continuing policy, custom or practice of inadequately supervising and disciplining officers for excessive force.

217.    SLMPD failed to implement any new policies or practices to identify or discipline officers for the use of excessive force against individual citizens, particularly in a police brutality protest context, even after demonstrated unconstitutional behavior by SLMPD officers. SLMPD continues to employ, promote and even give additional responsibility to SLMPD officers with a known history of abusive behavior towards protestors.

218.    SLMPD's policy, practice or custom of protecting its officers from the consequences of their unconstitutional behavior—such as clothing officers in riot gear including face masks that hide the officers' identities, allowing officers not to wear name tags or other forms of public identification, failing to document the names and badge numbers of all officers involved in the arrests of protesters, and failing to document the use of force against protestors in any way— evidences the City's deliberate indifference, and complete failure to adequately supervise or discipline its officers to assure compliance with state and federal laws or the Constitution of the United States.

219.    Defendant City has ratified the unsafe and unconstitutional treatment of those arrested by SLMPD officers, particularly in protests, by its failure to adequately investigate complaints and failure to discipline or hold misbehaving officers accountable and remove those officers from direct contact with civilians.

220.    In these failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiff as alleged herein.

221.    As a direct result of the conduct of Defendant City described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

222.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

<u>**COUNT V**</u>
**Missouri State Law: Assault**
**(Against All Defendant Officers)**

223.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

224.    Defendant Officers' use of kettling, without warning and without a way to egress, caused Plaintiff to experience apprehension of immediate physical injury.

225.    The brandishing and deployment of chemical agents for no lawful reason by Defendant Officers caused Plaintiff to experience apprehension of immediate physical injury.

226.     The arrest of Plaintiff by Defendant Officers, without explanation, and the placement of Plaintiff's hands in zip cuffs purposely placed Plaintiff in apprehension of immediate physical injury.

227.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

228.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

229.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

230.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

231.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**COUNT VI**
**Missouri State Law: False Arrest**
**(Against All Defendant Officers)**

232.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

233.    On September 17, 2017, Plaintiff was arrested without any legal justification or probable cause by Defendant Officers.

234.    Defendant Officers proceeded to constrain and confine Plaintiff against Plaintiff's free will. There was no lawful justification for Defendants restraining and confining Plaintiff in the above manner.

235.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

236.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and

to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**COUNT VII**
**Missouri State Law: Abuse of Process**
**(Against All Defendant Officers and Defendant O'Toole)**

237.   Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

238.   Defendant Officers made an illegal, improper, and perverse use of process by arresting, charging, and detaining Plaintiff on September 17, 2017, without any legal justification or probable cause in order to harass and intimidate Plaintiff, which constitutes an improper collateral purpose. Defendant O'Toole was ultimately responsible for arresting, charging, and detaining Plaintiff, in his role as the acting Chief of Police.

239.   Defendant Officers acted willfully and knowingly when they abused legal process for unlawful purposes and with an illegitimate collateral objective, in that Defendants used legal process through their authority for purposes other than the legitimate investigation and prosecution of criminal acts.

240.   As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

241.   The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and

54

to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT VIII
### Missouri State Law: Malicious Prosecution
### (Against All Defendant Officers and Defendant O'Toole)

242.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

243.    Defendant Officers assisted in the filing of charges against Plaintiff after his arrest on September 17, 2017, with no probable cause that Plaintiff had committed a crime or ordinance violation. Defendant O'Toole was ultimately responsible for the filing of these charges in his role as the acting Chief of Police.

244.    Such charges were subsequently dismissed against Plaintiff.

245.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

246.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

247.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

248.     By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

249.     The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT IX
### Missouri State Law: Intentional Infliction of Emotional Distress
### (Against All Defendant Officers)

250.     Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

251.     By surrounding Plaintiff, assaulting Plaintiff, spraying Plaintiff in the face at point-blank range with a chemical agent, and arresting Plaintiff without probable cause, Defendant Officers committed acts that rose to the level of extreme or outrageous conduct that goes beyond the possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.

252.     On September 17, 2017, Defendant Officers, including but not limited to Defendants Karnowski, Aubuchon, Kiphart, and Long, began to arbitrarily and unconstitutionally pepper spray citizens who had complied with orders, causing chaos, fear and terror to Plaintiff.

253.     Defendant Officers' actions were intentional.

254.     Such actions by Defendant Officers have caused Plaintiff severe emotional distress that has resulted in bodily harm, as described above.

255.    Defendant Officers' sole motivation was to cause emotional distress to Plaintiff and the other people Defendants unlawfully arrested.

256.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

257.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

258.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

259.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

260.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**COUNT X**
**Missouri State Law: Negligent Infliction of Emotional Distress**
**(Against All Defendant Officers)**

261.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

262.    Alternative to Count IX, above, by surrounding Plaintiff, assaulting Plaintiff, and arresting Plaintiff without probable cause, Defendant Officers realized or should have realized that their conduct posed an unreasonable risk to Plaintiff.

263.    Defendant Officers knew or should have known that wearing tactical helmets, vests, shields, and batons; screaming war chants; and pounding their batons on the pavement; posed an unreasonable risk to Plaintiff by inciting extreme terror.

264.    Defendant Officers, including but not limited to Defendants Defendants Karnowski, Aubuchon, Kiphart, and Long , began to arbitrarily and unconstitutionally pepper spray citizens who had complied with orders, causing chaos, fear and terror to Plaintiff.

265.    Plaintiff was reasonably in fear for his own person because of the actions of Defendant Officers and suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendants' actions.

266.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

267.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

268.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he

PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

269.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

270.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

### COUNT XI
### Vicarious Liability Under City Charter
### (Against Defendants O'Toole and Deeken)

271.    Article VIII, Section 5 of the Charter of the City of St. Louis states that "[e]ach head of a department, office or division *shall* be responsible for the acts or omissions of officers and employees appointed by him, and may require bonds or other securities from them to secure himself." (Emphasis added).

272.    Defendant Officers are officers and employees of the Chief of Police.

273.    Defendant Officers were acting in the scope of their employment when they committed the offenses described in this Complaint.

274.    Accordingly, pursuant to Article VIII, Section 5, the Director of Public Safety and Chief of Police are vicariously liable for the acts and omissions of the Defendant Officers, as described in this Complaint.

275. The Director of Public Safety, Defendant Deeken, and the Chief of Police, Defendant O'Toole, are therefore responsible for any damages awarded as a result of the injuries suffered at the hands of the Defendant Officers as described above in this Complaint.

<u>**COUNT XII**</u>
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Excessive Force**
**(Against All Defendant Officers)**

276. Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

277. Defendants engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

278. The use of force against Plaintiff was objectively unreasonable

279. Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee, Daut, Nicholas Lee, and John Doe used excessive force by restraining Plaintiff or tying Plaintiff's hands in the zip-cuffs.

280. An unidentified officer used excessive force by dragging Plaintiff.

281. Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee, Daut, Nicholas Lee, and John Doe used excessive force by beating Plaintiff.

282. The use of kettling, without warning, was objectively unreasonable and constituted excessive force.

283. As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

284.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

285.    At all times, Defendants were acting under color of state law.

286.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT XIII
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment:
### Failure to Intervene in Use of Excessive Force
### (Against All Defendant Officers and Defendant O'Toole)

287.    Plaintiff incorporates the preceding paragraphs of this Complaint as if set forth fully herein.

288.    To the extent that individual Defendants Officers did not participate in specific acts of excessive use of force against Plaintiff on September 17, 2017, said Defendants witnessed such conduct and failed to intervene to prevent it from occurring and/or to lessen its severity, despite having the means to do so.

289.    During all events that occurred on September 17, 2017 that are described in the Complaint, Defendant O'Toole was in the Real Time Crime Center. He was communicating with officers in the ground, was aware of and approved the plan to conduct the kettling arrest of Plaintiff and other persons. During the kettling event, Defendant O'Toole was using Real Time Crime Center cameras to monitor the unlawful mass arrest and could see the excessive force being deployed on Plaintiff and other citizens. At all times, Defendant O'Toole had the ability to intervene and order the other officers to cease with the unconstitutional arrest and use of excessive

force on Plaintiff and other citizens.

290.    Defendant Officers and O'Toole knew the seizure of Plaintiff was unreasonable, without probable cause, and illegal.

291.    Defendant Officers and O'Toole knew the force used against Plaintiff on September 17, 2017 was unreasonable under the circumstances and was clearly excessive.

292.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

293.    Defendant engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

294.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

295.    Defendants acted under color of state law.

296.    If Plaintiff prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT XIV
### Missouri State Law: Battery
### (Against All Defendant Officers)

297.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

298.    During the process of being unconstitutionally arrested, Plaintiff suffered battery at the hands of Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee, Daut, Nicholas Lee, and John Doe.

299.    The physically aggressive tactics of Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee, Daut, Nicholas Lee, and John Doe caused intentional and offensive bodily harm to Plaintiff.

300.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

301.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

302.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

303.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

304.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**WHEREFORE**, Plaintiff prays for judgment against all Defendants for their conduct and claims set forth above for compensatory damages, punitive damages, attorneys' fees, expenses, costs, and for any other relief this Court deems just and appropriate.

Date: October 21, 2020

Respectfully submitted,

**KHAZAELI WYRSCH LLC**

/s/ Javad Khazaeli
Javad Khazaeli, MO 53735
James R. Wyrsch, MO53197
Kiara Drake, MO 67129
911 Washington Avenue, Suite 211
Saint Louis, MO 63101
(314) 288-0777
(314) 400-7701 (fax)
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com
kiara.drake@kwlawstl.com

**ARCHCITY DEFENDERS, INC.**

Blake A. Strode (MBE #68422MO)
John M. Waldron (MBE #70401MO)
Maureen G. Hanlon (MBE #70990MO)
Nathaniel R. Carroll (MBE #67988MO)
440 N. 4th St., Suite 390
Saint Louis, MO 63102
855-724-2489 ext. 1021
314-925-1307 (fax)
bstrode@archcitydefenders.org
jwaldron@archcitydefenders.org
mhanlon@archcitydefenders.org
ncarroll@archcitydefenders.org

*Attorneys for Plaintiff*