IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
MISSOURI EASTERN DIVISION

| | | |
|---|---|---|
| Demetrius Thomas, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF SAINT LOUIS, et al, | ) | Cause No.: 4:18-cv-01566-JAR |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' ANSWER
## TO PLAINTIFF'S FOURTH AMENDED COMPLAINT

Remaining defendants file this answer and affirmative defenses to

Plaintiff's Fourth Amended Complaint. Any averment of fact that is not expressly

admitted herein is denied.

## JURISDICTION AND VENUE

1.      This claim is brought pursuant to 42 U.S.C. § 1983, the Fourteenth

Amendment to the United States Constitution, and the First and Fourth

Amendments, as incorporated as against States and their municipal divisions

through the Fourteenth Amendment.

**ANSWER:    Paragraph 1 states no allegations of fact, requiring no response.**

**To the extent a response is required, Defendants admit that Plaintiff brings this**

**action under 42. U.S.C. § 1983, but denies the apparent allegation of a direct action**

**under the First, Fourth, and Fourteenth Amendments to the Constitution of the**

United States.

2.     The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331

because Plaintiff's action arises under the Constitution of the United States and §

1343(a)(3) to redress the deprivation of rights secured by the Constitution of the

United States.

**ANSWER:    Paragraph 2 states no allegations of fact, requiring no response.**

**To the extent a response is required, Defendants admit that this Court has**

**jurisdiction.**

3.     Venue is proper in the United States District Court for the Eastern

District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of

the events giving rise to the claims occurred in the City of St. Louis.

**ANSWER:    Paragraph 3 states no allegations of fact, requiring no response.**

**To the extent a response is required, Defendants admit that venue is proper.**

4.     Divisional venue is proper in the Eastern Division because a

substantial part of the events leading to the claims for relief arose in the City of St.

Louis and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1),

(B)(1).

**ANSWER:    Paragraph 4 states no allegations of fact, requiring no response.**

**To the extent a response is required, Defendants admit that venue is proper.**

5.     This Court has supplemental jurisdiction over the included Missouri

state law claims pursuant to 28 U.S.C. §1367.

**ANSWER:    Paragraph 5 states no allegations of fact, requiring no response.**

To the extent a response is required, Defendants deny paragraph 5's allegations.

6.      Plaintiff demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

**ANSWER:   Defendants admit that Plaintiff has requested a jury trial.**

## PARTIES

7.      Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first- class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

**ANSWER:   Defendants admit that the City of St. Louis is a constitutional charter City organized and existing under the laws of the State of Missouri, but denies all other allegations of paragraph 7.**

8.      The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

**ANSWER:   Defendants admit that the division of police is a division or agency of the City of St. Louis and is commonly known as the St. Louis Metropolitan Police Department, and that the Division of Police operates in accordance with law as a division within City government, but denies all other allegations of paragraph 8.**

9.      The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

**ANSWER:   Defendants deny the allegations of paragraph 9.**

10.      Lawrence O'Toole was employed as a Lt. Colonel with the SLMPD

during the events of September 17, 2017, as detailed in this Complaint. On that date, he was the acting Chief of Police and, along with Defendant Charlene Deeken, was responsible for all management and direction of the SLMPD. Defendant O'Toole knew or should have known that there was no probable cause for the arrests of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant O'Toole is a department head and is covered by Article VIII, Section 5 of the Charter of the City of St. Louis. Defendant O'Toole is sued in his individual capacity.

**ANSWER:   Defendants admit Lawrence O'Toole is employed as a police officer with the division of police. Defendants admit he was the Acting Chief of Police on September 17, 2017. Defendants deny all remaining allegations of paragraph 10.**

11.   Charlene Deeken was employed as the Director of Public Safety for the City of St. Louis during the events of September 17, 2017. SLMPD is a subdivision of the St. Louis Department of Public Safety. As such, she was the direct supervisor of Defendant O'Toole. On September 17, 2017, Defendant Deeken and Defendant O'Toole were responsible for all management and direction of the SLMPD. Defendant Deeken is a department head and is covered by Article VIII, Section 5 of the Charter of the City of St. Louis. Defendant Deeken is sued in her individual capacity.

**ANSWER:   Defendants admit Charlene Deeken was employed as the Acting Director of Public Safety on September 17, 2017. Defendants deny all**

4

remaining allegations of paragraph 11.

12. Gerald Leyshock is employed as a police officer with the SLMPD. Mr. Leyshock has the rank of lieutenant colonel. Mr. Leyshock was the incident commander during the events of September 17, 2017. Lieutenant Colonel Leyshock knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Leyshock is sued in his individual capacity.

**ANSWER:   Defendants admit Gerald Leyshock is employed as a police officer with the division of police and has the rank of lieutenant colonel. Defendants admit Gerald Leyshock was the incident commander during the events of September 17, 2017. Defendants deny all remaining allegations of paragraph 12.**

13.  Timothy Sachs is employed as a police officer with the SLMPD. Mr. Sachs has the rank of lieutenant. Mr. Sachs was on the ground supervising SLMPD officers during the events of September 17, 2017. He ordered the use of chemical agents and brought SLMPD's Civil Disobedience Team to the scene of the mass arrest. Lieutenant Sachs knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Sachs is sued in his individual capacity.

**ANSWER:   Defendants admit Timothy Sachs was employed with the division of police and had the rank of lieutenant. Defendants admit Timothy Sachs was present for protest activities and police response on September 17, 2017. Defendants deny all remaining allegations in paragraph 13.**

14. Daniel Howard is employed as a police officer with the SLMPD. Defendant Howard has the rank of major. On the night of the incident, he was commander of the South Patrol. Howard was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Howard also assisted Leyshock with planning the kettling event. Defendant Howard knew or should have known that there was no probable cause for the arrests of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Howard is sued in his individual capacity.

**ANSWER:   Defendants admit Daniel Howard was employed with the division of police and had the rank of lieutenant. Defendants admit Defendant Howard  was present for protest activities and police response on September 17, 2017. Defendants deny all remaining allegations in paragraph 14**

15.     Randy Jemerson is employed as a police officer with the SLMPD. Mr. Jemerson has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Jemerson was on the ground supervising SLMPD officers during the events of September 17, 2017. Sergeant Jemerson knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Jemerson is sued in his individual capacity.

**ANSWER: Defendants admit Randy Jemerson is currently employed as a police officer with the division of police and has the rank of lieutenant. Defendants**

admit that Randy Jemerson was a supervisor with the Civil Disobedience Team. **Defendants deny all remaining allegations in paragraph 15.**

16.    Brian Rossomanno is employed as a police officer with the SLMPD. Mr. Rossomanno has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Rossomanno was on the ground supervising SLMPD officers during the events of September 17, 2017. Sergeant Rossomanno knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Rossomano is sued in his individual capacity.

**ANSWER: Defendants admit Brian Rossomanno was employed with the division of police and had the rank of sergeant during the events of September 17, 2017. Defendants admit Brian Rossomanno was a supervisor of the Civil Disobedience Team. Defendants deny all remaining allegations in paragraph 16.**

17.    Defendant Lieutenant Kimberly Allen, Lieutenant Scott Aubuchon, Lieutenant Scott Boyher, Lieutenant Daniel Chitwood, Lieutenant James Joyner, Lieutenant Christi Marks, Lieutenant Michael Mayo, Lieutenant Donnell Moore, Lieutenant Paul Piatchek, Sergeant Eric Bartlett, Sergeant Ronald Bergmann, Sergeant Michael Binz, Sergeant James Buckeridge, Sergeant Curtis Burgdorf, Sergeant Joe Carretero, Sergeant Anthony Caruso, Sergeant James Clark, Sergeant Darnell Dandridge, Sergeant Adam Duke, Sergeant Kelly Fisher, Sergeant Brandt Flowers, Sergeant Samuel Gilman, Sergeant Patrick Haug,

Sergeant John Jones, Sergeant Matthew Karnowski, Sergeant Robert Lammert, Sergeant Joe Lankford, Sergeant Robert Laschober, Sergeant Tom Long, Sergeant Kyle Mack, Sergeant Mike Mandle, Sergeant Michael Marks, Sergeant Mark McMurry, Sergeant James Murphy, Sergeant Dennis Neal, Sergeant Patricia Nijkamp, Sergeant Kenneth Nizick, Sergeant Donald Re, Sergeant Bradley Roy, Sergeant Daniel Schulte, Sergeant Michael Scego, Sergeant Timothy Schumann Sergeant Brian Seppi, Sergeant Stephen Slama, Sergeant Cliff Sommer, Sergeant Timothy Turner, Sergeant Scott Valentine, Sergeant Charles Wall, Sergeant Donnell Walters, Sergeant Scott Weidler, Sergeant Carolyn Wiener, and Sergeant Anthony Wozniak ("Supervisor Officers") were employed as senior officers with the SLMPD during the events of September 17, 2017, as detailed in this Complaint. According to the City's own documents, Supervisor Officers supervised SLMPD Officers during the events in question, directed the police officers in their command to arrest the persons at the intersection of Washington and Tucker, and knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. These Defendant are sued in their individual capacities.

**ANSWER: The individuals named in paragraph 17 have been dismissed as defendants from this case, so no answer is required. (Doc. 130)**

18.    Defendants Tranton Lee, Brian Lemons, Joseph Rodriguez, Timothy McNamara, Patrick Daut, and Nicholas Lee are employed as police officers with the SLMPD. Defendants Trenton Lee, Lemons, Rodriguez, McNamara, Daut, and

Nicholas Lee knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendants Trenton Lee, Lemons, Rodriguez, McNamara, Daut, and Nicholas Lee are sued in their individual capacities.

**ANSWER:   Defendants admit Lee, Lemons, Rodriguez, McNamara, Daut and Lee are employed as a police officers with the division of police. Defendants deny all remaining allegations in paragraph 18.**

19.    There are other unidentified SLMPD officers who have not been named as defendants in this litigation who contributed to, and/or participated in, the conduct described herein. These unnamed officers prevented Plaintiff from leaving the area, and unlawfully arrested Plaintiff. Plaintiff has been unable to identify those officers because some of the officers removed their name tas from their uniforms in violation of guidance promulgated by the U.S. Department of Justice and standard law enforcement practices. Further, the officers wore masks concealing their faces. In violation of its policies, the City of St. Louis and SLMPD failed to properly document the arrests and various use of force against Plaintiff and other persons arrested that evening. The City of St. Louis and SLMPD also failed to conduct an adequate investigation into the identity of the officers who were involved in the kittling incident. To this day, the City cannot identify every officer involved in the incident. But for the actions of the individual officers, the SLMPD, and the City of St. Louis, these officers could have been identified. Additionally, unidentified officers described below knew or should have known that there was no

probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

ANSWER: Defendants deny paragraph 19's allegations.

20. Demetrius Thomas is a resident of Belleville, Illinois who often works as an independent journalist in St. Louis.

ANSWER: Defendants are without sufficient information to form a belief as to the truth of paragraph 20's allegations, and therefore denies the same.

FACTS

21. On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Court Judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith.

ANSWER:   Defendants admit the allegations of paragraph 21.

22.   Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

ANSWER:   Defendants admit paragraph 22's allegations

23.   In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

ANSWER:   Defendants admit that, in response to threats of civil disorder, police officers were deployed at various locations, but Defendants deny that all

such officers were fully equipped with riot gear or chemical agents; Defendants deny all other allegations of paragraph 23.

24.     This is in stark contrast to SLMPD's appearance at a multitude of other un-permitted protests where the police themselves are not the target of the protest, including an anti- Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017, the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

**ANSWER:   Defendants deny paragraph 24's allegations.**

25.     The vast majority of protestors and protestor activity were non-violent and confined to peaceful marching and chanting.

**ANSWER:   Defendants deny paragraph 25's allegations.**

26.     During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest activity, including but not limited to the following:

a.      The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

b.      The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

c.      The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

d.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

e.     The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

f.     The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

g.     The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

h.     The evening of Friday, September 15, 2017, on Hortense Place.

i.     The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

j.     The evening of September 29, 2017 outside of Busch Stadium.

**ANSWER:    Defendants admit that in responding to illegal conduct by persons engaged in disorderly protest and other group actions in September 2017 in the City of St. Louis, some police officers utilized chemical agents in a reasonable and lawful manner; Defendants otherwise denies each and every allegation of paragraph 26 and each subparagraph thereof.**

27. These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents without warning.

**ANSWER:    Defendants deny paragraph 27's allegations.**

28.     In October 2014, SLMPD fired chemical agents at protestors on South Grand.

**ANSWER:    Defendants deny paragraph 28's allegations.**

29.     In November 2014, SLMPD officers fired chemical agents at

protestors on South Grand as well as into a business where peaceful protestors

had congregated. SLMPD officers refused to allow the protestors to leave.

    **ANSWER:   Defendants deny paragraph 29's allegations.**

    30.    On December 11, 2014, a federal judge in this District issued a

temporary restraining order enjoining the SLMPD from enforcing any rule, policy,

or practice that grants law enforcement officials the authority or discretion to:

> (1)    utilize tear gas, inert smoke, pepper gas, or other chemical
> agents (collectively, "chemical agents") for the purpose of dispersing
> groups of individuals who are engaged in peaceful, non-criminal
> activity in the City of St. Louis or in the County of St. Louis
>
> (a)    without first issuing clear and unambiguous warnings that
> such chemical agents will be utilized;
> (b)    without providing the individuals sufficient opportunity to
> heed the warnings and exit the area;
> (c)    without minimizing the impact of such chemical agents on
> individuals who are complying with lawful law enforcement
> commands; and
> (d)    without ensuring that there is a means of safe egress from the
> area that is available to the individuals; and
>
> (2)    utilize chemical agents on individuals engaged in peaceful,
> non-criminal activity in the City of St. Louis or in the County of St.
> Louis for the purpose of frightening them or punishing them for
> exercising their constitutional rights.

*See* Exh. B, Temporary Restraining Order in *Templeton v. Dotson*, 2015 WL

13650910, No. 4:14-cv-02019 at *3 (E.D. Mo. Dec. 11, 2014).

    **ANSWER:   Defendants admit that an order was entered as reflected in**

**Exhibit B and that a portion of that order is quoted in paragraph 30; Defendants**

**deny all other allegations of paragraph 30.**

    31.    This suit was in response to SLMPD firing chemical agents into a

business where peaceful protestors had congregated without allowing the

protestors to leave.

**ANSWER:   Defendants deny paragraph 31's allegations.**

32.    The City entered into a settlement agreement on March 25, 2015,

where it agreed as follows:

A.    Defendant and their agents, servants, employees, and
representatives, will not enforce any rule, policy, or practice that
grants law enforcement officials the authority or discretion to:

(1)      utilize tear gas, inert smoke, pepper gas, or other chemical
agents (collectively, "chemical agents") for the purpose of
dispersing groups of individuals who are engaged in non-
criminal activity:

(a)    without first issuing clear and unambiguous warnings
that such chemical agents will be utilized;
(b)    without providing the individuals sufficient opportunity
to heed the warnings and exit the area;
(c)    without reasonably attempting to minimize the impact
of such chemical agents on individuals who are complying
with lawful law enforcement commands; and
(d)    without ensuring that there is a means of safe egress
from the area that is available to the individuals and
announcing this means of egress to the group of individuals.

(2)      utilize chemical agents on individuals engaged in non-
criminal activity for the purpose of frightening them or
punishing them for exercising their constitutional rights.

B.    Provided, however, that Paragraph A hereof shall not be
applicable to situations that turn violent and persons at the scene
present an imminent threat of bodily harm to persons or damage to
property, and when law enforcement officials must defend themselves
or other persons or property against such imminent threat.

*See* Exh. C, Settlement Agreement in *Templeton v. Dotson*, No. 4:14-cv-

02019 (E.D. Mo. Mar. 25, 2015) at 1-2.

**ANSWER:** Defendants admit that the City of St. Louis entered into a consent decree in settlement of claims in the case styled *Templeton v. Dotson, et al.*, as reflected in Exhibit C and that a portion of the consent decree is quoted in paragraph 32; Defendants object to allegations pertaining to a settlement agreement as a basis for a complaint and Defendants deny all other allegations of paragraph 32.

33. Less than two months after entering into this Consent Decree, SLMPD began to violate the Decree.

**ANSWER:** Defendants deny paragraph 33's allegations.

34. On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge another SLMPD officer for killing another African-American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning.

**ANSWER:** Defendants deny paragraph 34's allegations.

35. On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. Sarah Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. Thirty minutes after the protests

had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns.

**ANSWER:   Defendants deny paragraph 35's allegations.**

36. On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents.

**ANSWER:   Defendants admit that a group of violent persons attempted to invade the premises of a correctional facility known as the Medium Security Institution of the City of St. Louis in July 2017, and that reasonable and lawful measures were taken by police officers to protect themselves and the facility; Defendants otherwise deny the allegations of paragraph 36.**

37.   Defendant' action in the instant matter follows the same script whereby SLMPD officers violate the Constitutional rights of people expressing their First Amendment right to protest against the police. Defendant' pattern and practice of illegally arresting and using chemical munitions against peaceful citizens is not only well documented but is detailed in *Ahmad* and *Templeton.*

**ANSWER:   Defendants deny paragraph 37's allegations.**

38.   This pattern and practice of utilizing chemical agents on individuals

engaged in peaceful, non-criminal activity continued on September 17, 2017.

**ANSWER:   Defendants deny paragraph 38's allegations.**

39.    According to testimony Defendant Rossomanno gave in federal court, on September 17, 2017, between 8:00 PM and 9:00 PM, a handful of individuals broke windows and destroyed flowerpots on the 900, 1000, and 1100 blocks of Olive Street in downtown St. Louis.

**ANSWER:   Defendants admit at various points on September 17, 2017 individuals engaged in various forms of property damage. Defendants deny the remaining allegations in paragraph 39.**

40.    At the time of this incident, the SLMPD arrested numerous individuals for his vandalism.

**ANSWER:   Defendants deny paragraph 40's allegations.**

41.    There is no evidence nor allegations that Plaintiff was in any way involved in this destruction of property.

**ANSWER:   Defendants deny paragraph 41's allegations.**

42.    Plaintiff is not aware of any evidence that any person arrested during the kettle was in any way involved in the destruction of property.

**ANSWER:   Defendants are without sufficient information to form a belief as to what the Plaintiff is aware of, and therefore denies paragraph 42's allegations.**

43.    Defendant Leyshock was the incident commander directing all of the supervisors including the other named Defendant.

**ANSWER:   Defendants admit that Defendant Leyshock was the incident commander on September 17, 2017. Defendants deny paragraph 43's allegations.**

44.   Defendant Sachs was in direct command of the officers in tactical gear.

**ANSWER:   Defendants deny paragraph 44's allegations.**

45.   At approximately 8:48 PM the small number of protestors present at the time were ordered to disperse and could "be subject to arrest and/or chemical munitions."

**ANSWER:   Defendants admit protestors were given repeated dispersal orders and warned of the possibility of arrests and chemical munitions. Defendants otherwise deny paragraph 45's allegations.**

46.   A second dispersal order was given at 8:51 PM.

**ANSWER:   Defendants admit protestors were given repeated dispersal orders and warned of the possibility of arrests and chemical munitions. Defendants otherwise deny paragraph 46's allegations.**

47.   Defendant Rossomanno and Jemerson directed people to the intersection of Washington and Tucker, where the Defendant had already decided that they would kettle, pepper spray, beat, and illegally arrest Plaintiff.

**ANSWER:   Defendants deny paragraph 47's allegations.**

48.   These dispersal orders could not be heard or understood by other police officers, let alone civilians in the area. In testimony given later in federal court, Defendant Sachs testified that he heard some sort of order being given, but that he could not make out "exactly what was being said."

18

**ANSWER:    Defendants deny paragraph 48's allegations.**

49.    Over the next two plus hours, SLMPD officers began blocking roads and directing civilians to the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER:    Defendants admit that on September 17, 2017 officers blocked certain roads downtown. Defendants otherwise deny the allegations of paragraph 49.**

50.    Defendant Karnowski and the officers under his command began to "push (the protestors) north" toward Washington Avenue and Tucker Boulevard. He also testified that he determined that the protest that evening was an "unlawful assembly."

**ANSWER: Defendants admit that on the evening of September 17, 2017 an unlawful assembly was occurring in the vicinity of Washington and Tucker. Defendants otherwise deny paragraph 50's allegations.**

51.    This area is home to many condominiums, apartment buildings, and businesses, including restaurants and bars.

**ANSWER: Defendants admit paragraph 51's allegations.**

52.    Defendant Sachs came up with the plan to arrest everyone present. He presented his plan to Defendant Leyshock, who approved the plan. The plan was to not let anyone leave that was in the vicinity of Washington Avenue and Tucker Boulevard.

**ANSWER:    Defendants admit that probable cause existed to arrest persons**

at Tucker and Washington and that defendant Leyshock and Sachs took measures to prepare to arrest persons who did not disperse in accordance with repeated orders; otherwise denied.

53. Defendant Leyshock, Sachs, Rossomanno, and Jemerson knew or should have known that their plan to kettle the people that SLMPD directed to the intersection of Washington and Tucker and arrest them, merely for being present, would result in arrests without probable cause and the unjustified use of force to effectuate said arrests.

**ANSWER:**   Defendants deny paragraph 53's allegations.

54.   At approximately 11:15 PM or 11:20 PM, SLMPD officers began forming into lines.

**ANSWER:**   Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 54's allegations.

55.   This was nearly three hours after the windows and flower pots were broken and many blocks away from the damaged businesses.

**ANSWER:**   Defendants deny paragraph 55's allegations.

56.   SLMPD's Civil Disobedience Team appeared at the scene.

**ANSWER:**   Defendants admit paragraph 56's allegations.

57.   According to the Civil Disobedience Response Operations Plan created by the SLMPD, the Civil Disobedience Team was broken down into South, Central and North Patrols, each further broken down into Alpha, Bravo, Charlie, Delta

squads and arrest teams ("CDT Squads").

**ANSWER:   Defendants admit that is the general organization of the CDT teams.**

58. In addition to the CDT Squads, officers from the Bicycle Response Team, Mobile Reserve - SWAT and Special Operations Unit actively participated in the kettling, arrests, and uses of force on Plaintiff and other citizens at the corner of Tucker and Washington.

**ANSWER:   Defendants deny paragraph 58's allegations.**

59. As identified in the Civil Disobedience Response Operations Plan, the police report of the incident, and the videos taken by the City, each Supervisor Officer is a supervisor of one of the participating CDT Squads, Bicycle Response Team, Special Operations team or Mobile Reserve – SWAT team.

**ANSWER:   Defendants deny paragraph 59's allegations.**

60. The Supervisor Officers were an integral part of the kettling and subsequent use of excessive force because they directed their subordinates to participate in the kettle and unlawfully seize Plaintiff and the other citizens arrested that night.

**ANSWER:   Paragraph 60 contains argumentative statements and legal conclusions rather than allegations of fact. To the extent a response is required, denied.**

61. A line of officers extended across all of the street and sidewalk on Washington Avenue one block west of Tucker Boulevard.

**ANSWER:**    Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 61's allegations.

62. A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block north of Washington Avenue.

**ANSWER**:    Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 62's allegations.

63. A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block south of Washington Avenue.

**ANSWER**:    Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 63's allegations.

64. All three of these lines were comprised of officers all wearing military-like tactical dress, including helmets. These officers were carrying long wooden batons and full-body riot shields.

**ANSWER**:    Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 64's allegations.

65. A fourth line of extended across all of the street and sidewalk on Washington Avenue one half block east of Tucker Boulevard.

**ANSWER**:    Defendants admit police officers formed lines in the vicinity of

Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 65's allegations.

66. Each of the four lines began to approach the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER**:   Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 66's allegations.

67. Without further instruction or warning, SLMPD officers surrounded Downtown residents, business patrons, protestors, observers, and members of the press, cutting off all routes of egress - including via any sidewalk - and prohibiting the people trapped inside from leaving.

**ANSWER:**   Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants admit that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise deny paragraph 67's allegations.

68.    As they approached, the SLMPD police officers began banging batons against their riot shields and the street in unison causing a foreboding and terrifying sound, akin to a war march.

**ANSWER: Defendants deny paragraph 68's allegations.**

69.    As the SLMPD police officers began to close in on the citizens that SLMPD had forced into the intersection of Washington Avenue and Tucker

Boulevard, the officers blocked anyone from leaving the area.

**ANSWER: Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants admit that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise deny paragraph 69's allegations.**

70. Multiple citizens approached officers and requesting to be let past. These peaceful and lawful requests were not only ignored but responded to by screams of "get back!"

**ANSWER:   Defendants deny paragraph 70's allegations.**

71. In addition, the closing phalanxes of officers cut off access to all alleys and other means of egress.

**ANSWER: Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants admit that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise deny paragraph 71's allegations.**

72. As the four lines closed, they trapped everyone who was within a one-block radius of the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER: Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants admit that probable cause existed to arrest persons at Tucker**

and Washington and some such persons were arrested on probable cause on
September 17, 2017. Defendants otherwise deny paragraph 72's allegations.

73. This is a law enforcement tactic known as "kettling."

 ANSWER;   Defendants deny paragraph 73's allegations.

74. The SLMPD police officers kettled a wide variety of innocent citizens,
including self-admitted protestors, residents who merely lived in the area, people
visiting businesses in the area, reporters, documentarians, and homeless persons.

ANSWER:   Defendants deny paragraph 74.

75. The officers even grabbed an African-American male who was outside of
the kettle and threw him into the kettle.

ANSWER:   Defendants deny paragraph 75.

76. As the kettle closed, many individuals approached the officers and begged
to pass.

ANSWER:   Defendants deny paragraph 76.

77. Not surprisingly, the individuals in the kettle gravitated toward the line
of bicycle officers rather than three lines of police in military gear, who were
banging wooden batons against their riot shields.

ANSWER:   Defendants are without sufficient knowledge to form a belief as
to the truth of paragraph 77's allegations, and therefore denies the same.

78. Individuals peacefully approached the bicycle officers with their hands
up.

ANSWER:   Defendants deny paragraph 78's allegations.

79. In response, the bicycle officers began to aggressively jab at the individuals using their bicycles as battering rams.

**ANSWER:** **Defendants deny paragraph 79.**

80. The Supervisor Officers were directing these officers.

**ANSWER:** **Defendants deny paragraph 80.**

81. Rather than defuse the situation, many of the Supervisor Officers directed the officers under their command to use force against the peacefully assembled people and supervised the unlawful arrests. The other Supervisor Officers made no attempt to stop the illegal use of force and the unlawful arrests.

**ANSWER:** **Defendants deny paragraph 81.**

82. Some Supervisor Officers, including Defendant Karnowski, Aubuchon, Kiphart, and Long, actively engaged in the use of excessive force by arbitrarily and unconstitutionally pepper spraying peaceful citizens who were in compliance with police orders, to the extent they were even given. Their actions caused Plaintiff to experience chaos, fear and terror.

**ANSWER:** **Defendants deny paragraph 82.**

83. Those other Supervisor Officers that did not actually deploy pepper spray or put their hands on citizens still stood and watched as others did use excessive force and failed to intervene despite having the authority and opportunity to do so.

**ANSWER:** **Defendants deny paragraph 83.**

84. Some of the Supervisor Officers, including Defendant Karnowski, Aubuchon, Kiphart actively engaged in the unconstitutional use of pepper spray on

innocent civilians. The others stood by and watched as civilians, including Plaintiff, were unconstitutionally arrested, beaten, pepper-sprayed, and failed to intervene in the violation of Plaintiff's civil rights.

>   **ANSWER:**   Defendants deny paragraph 84.

85. At the very beginning of the kettle, a few people caught in the crowd peacefully stood with their hands up in front of the line of officers, trying to understand what was happening. Defendant Karnowski instigated the violent attacks against the innocent citizens when he unleashed pepper spray against several citizens who were peacefully standing still with their hands up. At no time was Defendant Karnowski in any danger as he was safely standing with a line of bicycle officers between him and the citizens. All of his illegal actions were documented on a video camera strapped to his helmet.

>   **ANSWER:**   Defendants deny paragraph 85.

86. Almost immediately after, Defendant Aubuchon followed suit and indiscriminately sprayed numerous innocent civilians.

>   **ANSWER:**   Defendants deny paragraph 86.

87. The use of excessive force at the outset of the arrest by a lieutenant and sergeant was tacit approval to the other officers to engage in the same unconstitutional behavior. Their behavior resulted in a domino effect of excessive force and unconstitutional behavior on Plaintiff and the others arrested that evening.

>   **ANSWER:**   Defendants deny paragraph 87.

88. Almost instantly and in unison, the other individuals in the kettle put their hands in the air as a sign of peaceful surrender.

**ANSWER:   Defendants deny paragraph 88.**

89. Many laid prostrate on the ground. Others sat down. And others, who could not fully get to the ground because of the mass of people inside of the kettle, got as close to the ground as possible.

**ANSWER:   Defendants deny paragraph 89.**

90. Even though video evidence shows that none of the individuals inside the kettle were acting violently or aggressively, the individuals in the kettle were indiscriminately and repeatedly doused with chemical agents without warning.

**ANSWER:   Defendants deny paragraph 90.**

91. One of the Supervisor Officers, Defendant Kiphart, viciously attacked a journalist with a camera with pepper spray from a "fogger" which also sprayed indiscriminately into the crowd. Moments later, Detective Matthew Burle deployed another fogger blast towards the same journalist and those sitting near him with more pepper spray in the face, yet another concrete example of a subordinate officer taking a cue from a Supervisor Officer to engage in unconstitutional excessive force.

**ANSWER:   Defendants deny paragraph 91.**

92. Many of the persons arrested were kicked, beaten, and dragged.

**ANSWER:   Defendants deny paragraph 92.**

93. Some individuals caught in the kettle had been wearing goggles because they feared the deployment of chemical agents, based on the SLMPD's well known

pattern and practice of using chemical agents against peaceful protestors.

**ANSWER:   Defendants admit individuals were wore masks and goggles concealing their identities. Defendants otherwise deny paragraph 93's allegations.**

94. Others found paper masks on the ground or other objects in order to protect themselves as it became apparent that SLMPD was preparing to effectuate illegal and likely violent arrests.

**ANSWER:   Defendants admit individuals were wore masks and goggles concealing their identities. Defendants otherwise deny paragraph 94's allegations.**

95. In response, SLMPD officers roughly removed the goggles of some individuals and then sprayed them directly in the face.

**ANSWER:   Defendants deny paragraph 95's allegations.**

96. At the same time, SLMPD officers screamed derogatory and homophobic epithets at individuals as they were being arrested.

**ANSWER:   Defendants deny paragraph 96's allegations.**

97. These punitive measures were delivered without regard to the fact that the individuals were peaceful and compliant.

**ANSWER:   Defendants deny paragraph 97's allegations.**

98. Defendant Jemerson, Rossomanno, and the Supervisor Officers were within arms length of SLMPD officers who were pepper spraying and beating peaceful and compliant citizens. Rather than instructing these officers to cease violating the civil right of the citizens, these Defendant took control of the situation and directed the officers' unlawful actions.

**ANSWER:** Defendants deny paragraph 98's allegations.

99. SLMPD officers used hard plastic zip ties to arrest all of the individuals. Over two months later, several continue to suffer from pain and numbness in their hands due to the tightness of the zip ties.

**ANSWER: Defendants admit some plastic zip tie handcuffs were used in an appropriate manner. Defendants otherwise deny paragraph 99's allegations.**

100. Over 100 people were arrested that night.

**ANSWER:** Defendants admit paragraph 100's allegations.

101. During and after the arrests, SLMPD officers were observed high fiving each other, smoking celebratory cigars, taking selfies on their personal phones with arrestees against the arrestees will, and chanting "Whose Streets? Our Streets!"

**ANSWER: Defendants admit some chanting occurred for which officers were later reprimanded. Defendants otherwise deny the allegations of paragraph 101.**

102. That evening, the following celebratory picture was posted on Twitter by an anonymous person:



**ANSWER:** **Defendants admit the photo was posted by an anonymous person. Defendants otherwise deny the allegations of paragraph 102.**

103. By the coordinated actions of the officers in circling the assembly into the kettle and the systematic disbursement of the chemical agents, it is clear that these tactics were planned and that senior officials of the SLMPD not only had notice of but actually sanctioned the conduct of Defendant.

**ANSWER:** **Defendants deny paragraph 103's allegations.**

104. Defendant' actions did not occur randomly. Rather, Defendant decided beforehand that they would make an example of the arrestees in an attempt to scare other citizens from exercising their First Amendment rights to protest against the SLMPD's actions.

**ANSWER: Defendants deny paragraph 104's allegations**

105. SLMPD officers specifically hid their identity from observers and citizen

arrestees including Plaintiff by obscuring their identities the night of the incident, and by intentionally failing to record which officers seized or interacted with which arrestee. The officers hid their identity in order to scare and intimidate observers, terrorize the citizen arrestees, avoid any department accountability, avoid any civil or criminal legal responsibility, and to help fellow officers avoid identifying wrongdoers following the incidents.

**ANSWER:** **Defendants deny paragraph 105's allegations.**

106. The next day, the SLMPD Acting Chief reinforced the City's ratification of the Defendant' actions when he said, "I'm proud to say the city of St. Louis and the police owned the night," while standing next to Saint Louis Mayor Lyda Krewson.

**ANSWER:** **Defendants deny paragraph 106's allegations.**

107. The day after the arrests, Mayor Krewson further validated the illegal actions of Defendant when she thanked the officers "for the outstanding job they have been doing over the last three days." She added that she fully supported the actions of the officers.

**ANSWER:** **Defendants admit that St. Louis police properly enforced the law during the period in question. Defendants otherwise deny the allegations in paragraph 107.**

108.   Since then, the U.S. Attorney's Office brought indictments in federal court against 5 SLMPD Officers on the Civil Disobedience Team for the beating of an undercover police officer on September 17, 2017. Emails quoted in the

indictment show that the officers were informed ahead of time that they would be deployed wearing military-like tactical dress to conceal their identities in order to beat protestors. This is exactly what occurred to Plaintiff, under the direct supervision and control of Defendant Leyshock, Boyher, Sachs, Jemerson, Karnowski, Rossomanno.

**ANSWER:   Defendants admit certain officers have been indicted for unauthorized illegal activity. These officers are in the process of being disciplined. Defendants otherwise deny the allegations in paragraph 108.**

109. The indictment quoted text messages sent to and from the defendant officers regarding the mass arrest on September 17, 2017, that prove the vicious and unlawful intent of the officers and belie any post hoc justification for the kettling, use of chemical agents, excessive force, and arrests:

a. "The more the merrier!!! It's gonna get IGNORANT tonight!! But it's gonna be a of lot of fun beating the hell out of these shitheads once the sun goes down and nobody can tell us apart!!!!"

b. "R u guys in [South Patrol Division] prepping anything for the war tonight?" c. "We reloading these fools up on prisoner busses. As they got on we all said in unison 'OUR STREETS' haha."

d. "Yeah. A lot of cops gettin hurt, but it's still a blast beating people that deserve it. And I'm not one of the people hurt, so I'm still enjoying each night."

e. "The problem is when they start acting like fools, we start beating

the shit out of everyone on the street after we give two warnings."

f. "I'm on (Sgt **'s) arrest team! Me and a BIG OL black dude r the guys that are hands on! No stick or shield… just (expletive) people up when they don't act right! …"

G. The Police Department intentionally ignored its own policies.

**ANSWER:   Defendants admit certain officers have been indicted for unauthorized illegal activity. These officers are in the process of being disciplined. Defendants otherwise deny the allegations in paragraph 109.**

110. When detaining individuals in custody who require medical care, the City of St. Louis and its SLMPD has established the following policy:

PRISONERS REQUIRING MEDICAL ATTENTION (72.6.1)

1. A medical emergency is defined as a condition which a reasonable person would expect a result in loss of life or function. Examples of medical emergencies include severe bleeding, fractures with displacement (bone out of alignment), loss of consciousness, non-responsiveness, and respiratory distress, severe chest pain or severe shortness of breath. This list is not all-inclusive. If you have any doubts, contact the on-duty nurse at the City Justice Center for guidance.

2. Should a prisoner require emergency medical attention, whether the injury or illness occurred during incarceration or not, an Emergency Medical Service (EMS) unit will be requested to

respond to the holdover for medical evaluation and if necessary
conveyance to the hospital. EMS will determine the destination
hospital. An I/LEADS report will be prepared documenting all
treatment received by the prisoner. If immediate first aid is
administered by a Department employee or the paramedics, the
injury and treatment will be noted in the Prisoner's Log Book by
the booking clerk.

3. Should a prisoner require non-emergency medical attention, the on-
duty nurse at the City Justice Center will be contacted for
guidance.

4. The confidential relationship of doctor and patient extends to prisoner
patients and their physician.

5. In the event a prisoner is injured while in custody or shortly before
being taken into custody, the Watch Commander will arrange to
have photographs taken of any and all visible injuries. The
photographs will be treated as physical evidence. If practical, the
photos should be taken both prior to the application of bandages,
etc., and after the injury has received appropriate medical
attention

PRISONER HEALTH SCREENING (72.6.3)

The following prisoner medical "receiving screening" information will be
obtained and recorded on the Field Booking Form when prisoners are booked

and verified upon their transfer to another facility or release:

    1. Current health and medical history of the prisoner; (72.6.3.a)

    2. Medication taken by the prisoner; (72.6.3.b)

    3. Known medication/drug allergies;

    4. Behavior, including state of consciousness and mental status; and

(72.6.3.c) 5. Body deformities, trauma markings, bruises, lesions, jaundice

(a yellowness of the skin and whites of the eyes), and ease of movement

(72.6.3.d)

NOTE: a copy of the Field Booking Form **must** be attached to the

computerized Arrest Register whenever a prisoner is transferred to the City Justice

Center.

    **ANSWER: Defendants admit paragraph 110's allegations.**

    111. On information and belief, the SLMPD and City of St. Louis

Correctional Staff failed and/or refused to follow this policy when they provided no

medical care to any of the people illegally pepper sprayed.

    **ANSWER:   Defendants deny paragraph 111's allegations.**

    112. Defendant' decision to ignore the policy constitutes a custom and

practice of failing and/or refusing to follow this policy designed to protect the safety

and wellbeing of injured individuals in police custody, showing a deliberate

indifference by Defendant to the rights of Plaintiff and other injured detainees.

    **ANSWER:   Defendants deny paragraph 112's allegations.**

    113. Despite this policy, at no time between their arrest and their release

from the St. Louis City Justice Center did any police officer or other city official provide any arrestee with medical care or give anything to them to wash the chemical agents out of their eyes, off their bodies, or off their clothes.

**ANSWER:** **Defendants deny paragraph 113's allegations.**

114. Upon their release, all of the arrestees were given summonses showing that they had been charged with "failure to disperse." They were instructed to appear at St. Louis City Municipal Court on October 18, 2017.

**ANSWER:** **Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 114's allegations and therefore denies the same.**

115. They were charged as such even though SLMPD officers provided no means of egress, denied repeated requests to be allowed to leave, and kettled the individuals.

**ANSWER: Defendants deny paragraph 115's allegations.**

116. In at least one case, a person was thrown from outside of the kettle into the kettle by SLMPD and was subsequently arrested for failure to disperse.

**ANSWER:** **Defendants deny paragraph 116's allegations.**

117. The press release stated "[m]any of the demonstrators were peaceful, however after dark, the agitators outnumbered the peaceful demonstrators and the unruly crowd became a mob. Multiple businesses also sustained property damage and one officer suffered a serious injury."

**ANSWER:** **Defendants admit paragraph 117's allegations.**

118. Egregiously and in an attempt to further punish its victims, SLMPD publicly released the addresses of the arrestees.

**ANSWER:**   **Defendants deny paragraph 118's allegations.**

119. The video evidence, as the federal court observed, "shows no credible threat of force or violence to officers or property in this mixed commercial and residential area" – much less a mob. SLMPD also fails to mention that the "one officer who suffered a serious injury" was an undercover officer who was pepper sprayed and beaten by SLMPD.

**ANSWER:**   **Defendants deny paragraph 119's allegations.**

120. SLMPD used its Twitter account to disseminate this false statement to its approximately 70,000 followers. SLMPD subsequently deleted the tweet.

**ANSWER:**   **Defendants deny paragraph 120's allegations.**

121. During a preliminary injunction hearing, attorneys representing the City stated that it was the policy of the City of St. Louis that once property damage occurs, SLMPD is justified in declaring an unlawful assembly and then deploying chemical agents regardless of the proximity of the target individuals in time or space to the property damage and regardless of if the people were engaged in criminal activity. According to the City, officers are justified to use chemical agents or beat and arrest anybody merely for being close to the area, even hours after the criminal activity has occurred.

**ANSWER:**   **Defendants deny paragraph 121's allegations.**

122. On October 13, 2017, the St. Louis City Counselor's office issued a letter

stating "[a]s of today, the City Counselor is still reviewing the evidence against you in order to decide whether or not to file charges and it is not anticipated that this decision will be made prior to October 18, 2017. Therefore, you are released from any obligation to appear in Municipal Court on October 18, 2017, in connection with the offense being considered. After a review of the matter is completed, should a decision be made to file charges against you, you will be notified by mail of that decision and advised when and where to appear to defend against those charges."

**ANSWER:** Defendants admit paragraph 122's allegations.

123. On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Doc. 58, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

**ANSWER:** Defendants admit that an order was entered by the Court in the case referenced above. Defendants otherwise deny paragraph 123's allegations.

124. The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests." *Id.* at 2.

**ANSWER:** Defendants admit that paragraph 124 quotes from the order referenced, but Defendants deny all other allegations and conclusions of paragraph 124.

125. The Court found that on September 17, 2017, there was some property damage downtown but Defendant Sachs "testified that he was unaware of any property damage occurring in the downtown area after 8:30 PM". *Id.* at 9.

**ANSWER:**   Defendants admit that paragraph 128 quotes from the order referenced, but Defendants deny all other allegations and conclusions of paragraph 125.

126. The Court found that Defendant Rossomanno gave a dispersal order before 10:00 PM but that "this order did not specify how far protesters had to go to comply with the directive to leave the area." *Id.* at 8. The Court noted that Defendant Sachs "could not say 'exactly how far would be enough' to comply with this, or any, dispersal order." *Id.* at 8-9.

**ANSWER:**   Defendants admit that paragraph 126 quotes from the order referenced, but Defendants deny all other allegations and conclusions of paragraph 126.

127. The Court found that Defendant Sachs "testified that around 10:00 PM the decision was made to make a mass arrest of people remaining in the area of Tucker and Washington, which is three or four blocks away from where the earlier dispersal order was given." *Id.* at 9. Yet, SLMPD continued to "freely allowed people ingress into the area after the initial dispersal order was given." *Id.* at 11.

**ANSWER:**   Defendants admit that paragraph 127 quotes from the order referenced, but Defendants deny all other allegations and conclusions of paragraph 127.

128. The last known dispersal order was given approximately 45 minutes before the mass arrests began but approximately 45 after SLMPD made the decision to conduct a mass arrest. This final dispersal order was once again given approximately two blocks south of the intersection of Washington and Tucker. The dispersal order was "You are being ordered to disperse from the area of Locst and Tucker by walking north on Tucker or west on Locust." Rather than being a legitimate order, this was a trap. By complying with the order and moving north on Tucker as directed by police, the citizens were forced to the intersection of Washington and Tucker, which SLMPD had already disgnated as the mass arrest location. Even though the citizens complied with the order, they were arrested for failure to comply.

**ANSWER:   Defendants deny paragraph 128's allegations.**

129. The Court found that at approximately 11:30 PM SLMPD began a mass arrest of everyone in the vicinity even though video evidence presented to the Court "does not shows a large crowd congregating in the streets" and "[n]o violent activity by protesters can be observed on the video." *See* Doc. 58 at 10, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017). In fact, the "scene appears calm and most people appear relaxed." *Id.* at 10-11. The only signs of disobedience seen on the video are "four to five individuals" sitting on Tucker Avenue, which was closed, and a small group of people yelling at the police. *Id.* at 10.

**ANSWER:   Defendants admit that paragraph 129 quotes from the order**

referenced, but Defendants deny all other allegations and conclusions of paragraph 129.

130. The video was taken from approximately 10:45 PM to the time of the arrests at 11:30 PM *Id.* at 12.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 130's allegations and therefore denies the same.**

131. The video "shows an unidentified officer walking around with a hand-held fogger shooting pepper spray at the arrestees, who all appear to be on the ground and complying with police commands. This officer issues no verbal commands to any arrestee, and no arrestee on the video appears to be resisting arrest. The video shows other officers shouting at people on the ground and making threatening gestures at them with mace. An unidentified (person) lying face down on the ground is picked up by his feet by two officers and dragged across the pavement." *Id.* at 15-16.

**ANSWER:   Defendants admit that paragraph 131 quotes from the order referenced, but Defendants deny all other allegations and conclusions of paragraph 131.**

132. In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id.* at 37. Not surprisingly, the Court did not adopt this rationale

as a basis for the arrests and the use of chemical agents.

**ANSWER:   Defendants admit that paragraph 132 quotes from the order referenced, but Defendants deny all other allegations and conclusions of paragraph 132.**

133. The Court made the following findings:

a. Plaintiff are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiff. *Id.* at 35-36.

b. Plaintiff have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiff' First and Fourth Amendment rights. *Id.* at 36.

c. Plaintiff' evidence of the activities in the Washington and Tucker intersection on September 17, 2017, **shows no credible threat of force or violence to officers or property in this mixed commercial and residential area**. *Id.* at 37. (Emphasis added).

d. Plaintiff have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity

43

provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id.* at 37-38. Plaintiff have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of plaintiff' constitutional rights. *Id.*

    e. Similarly, Plaintiff have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiff' First and Fourth Amendment rights. *Id.* at 39.

    f. Plaintiff presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly

44

enforced, and retaliatory. *Id.* at 40.

g. Plaintiff have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id.* at 41.

h. Plaintiff have presented sufficient, credible testimony and video evidence from numerous witnesses that they were maced without warning in the absence of exigent circumstances while they were not engaging in violent activity and either were not in defiance of police commands (because none were given) or were complying with those commands. *Id.* at 42.

i. The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id.* at 43-44.

j. Plaintiff' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory

fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiff have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id.* at 44.

k. Plaintiff have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights. *Id.* at 44. That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008)(internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id.* at 44-45.

**ANSWER:**   Defendants admit that paragraph 133 quotes from the order referenced, but Defendants deny all other allegations and conclusions of paragraph 133 and each of its subparts.

134. Upon information and belief, senior officials of the SLMPD, including

Defendant Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno, and the Supervisor Officers, were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

**ANSWER:   Defendants deny the allegations and conclusions of paragraph 134.**

135.   At no point since the mass arrest in September 2017 has SLMPD Internal Affairs Division done an internal investigation of any kind into the numerous citizen complaints filed following the kettling.

**ANSWER:   Defendants deny the allegations and conclusions of paragraph 135.**

136.   On the evening of September 17, 2017, Mr. Thomas received a phone call from a friend telling him about protests that were occurring downtown.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 136's allegations and therefore denies the same.**

137.   Mr. Thomas headed downtown expecting to see large crowds gathering and marching. He brought two cameras and a drone to record any goings-on.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 137's allegations and therefore denies the same.**

138.    However, by the time Mr. Thomas arrived downtown, all of the protests had ended. As Mr. Thomas drove around, he did not see any protestors.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 138's allegations and therefore denies the same.**

139.    When he made it to Olive St. near Tucker St. police came out of nowhere and surrounded his vehicle.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 139's allegations and therefore denies the same.**

140.    A large group of officers passed Mr. Thomas's car. Me. Thomas decided to get out to record their actions.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 140's allegations and therefore denies the same.**

141.    He gave his friend a second camera to record the officers' actions.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 141's allegations and therefore denies the same.**

142.    Mr. Thomas and his friend walked on the sidewalk as they recorded the police.

**ANSWER: Defendants are without sufficient knowledge or information to**

form a belief as to the truth of paragraph 142's allegations and therefore denies the same.

143.    The first thing Mr. Thomas saw was SLMPD officers dressed in military-esque riot gear form a line and begin to chant loudly.

**ANSWER:   Defendants are without sufficient knowledge or information to form a believe as to the truth of paragraph 143's allegations and therefore deny the same.**

144.    Mr. Thomas changed his position, so he could get a better angle of the police.

**ANSWER:   Defendants are without sufficient knowledge or information to form a believe as to the truth of paragraph 144's allegations and therefore deny the same.**

145.    At this point, a police officer in a white shirt, who Mr. Thomas believed to be a supervisor, told Mr. Thomas that Mr. Thomas was permitted to record as long as he stayed on the sidewalk

**ANSWER:    Defendants are without sufficient knowledge or information to form a believe as to the truth of paragraph 145's allegations and therefore deny the same.**

146.    Mr. Thomas immediately complied and joined other members of the media, including a person known as "RebZ" on a sidewalk corner.

**ANSWER:    Defendants are without sufficient knowledge or information to form a believe as to the truth of paragraph 146's allegations and therefore deny the**

same.

147.    It should have been apparent to anyone that Mr. Thomas and the people he was gathered with were not protesting. Rather, they were exercising their constitutional rights to record law enforcement.

**ANSWER:   Defendants deny the allegations and conclusions of paragraph 147.**

148.    Because he was with an easily identifiable group of media members, Mr. Thomas believed that he was safe. Sadly he was wrong

**ANSWER:   Defendants deny the allegations and conclusions of paragraph 148.**

149.    Throughout the night, Mr. Thomas complied with the few directions that SLMPD officers gave him. When asked to move, he moved.

**ANSWER:   Defendants deny the allegations and conclusions of paragraph 149.**

150.    Eventually, it became apparent to him that SLMPD officers were repositioning themselves to surround and kettle everyone preset at the intersection of Washington Avenue and Tucker Blvd.

**ANSWER:   Defendants deny the allegations and conclusions of paragraph 150.**

151.    As the kittling began, Mr. Thomas did not observe anyone protesting or breaking any laws.

**ANSWER:   Defendants deny the allegations and conclusions of paragraph**

151.

152.    Mr. Thomas then observed a large black SLMPD police truck. The truck was making some inaudible announcement. A review of Mr. Thomas's recording confirms that whatever was being announced was undecipherable.

**ANSWER:    Defendants deny the allegations and conclusions of paragraph 152.**

153.    At this point, other than some chanting, the police were acting normal. They were smiling.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 153's allegations and therefore denies the same.**

154.    All of sudden, the demeanor of the officers changed. The officers began to beat their batons against the ground and their shields.

**ANSWER:    Defendants deny the allegations and conclusions of paragraph 154.**

155.    The civilians in the intersection grew concerned and asked the officers what they were doing. The officers did not respond.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 155's allegations and therefore denies the same.**

156.    Mr. Thomas attempted to leave via an alley, but an SLMPD officer blocked his path.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 156's allegations and therefore denies the same.**

157.   The officer was carrying a large baton and directed Mr. Thomas back to the intersection of Washington and Tucker.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 157's allegations and therefore denies the same.**

158.   Mr. Thomas immediately complied.

**ANSWER:   Defendants deny the allegation of paragraph 158.**

159.   Upon returning to the intersection, Mr. Thomas saw between 100-200 officers. The officers were pounding their batons against their shields and the ground.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 169's allegations and therefore denies the same.**

160. Terrified, Mr. Thomas attempted to get his car parked on Washington Ave., just west of Tucker.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 160's allegations and therefore denies the same.**

161. Police prevented Mr. Thomas from getting in his car and leaving, even

though Mr. Thomas was loudly pleading with them to be allowed to leave.

**ANSWER:    Defendants deny the allegations and conclusions of paragraph 161.**

162. In response to Mr. Thomas's pleas, and SLMPD officer pointed a large an of papper spray at Mr. Thomas and told him to "get out of here." The officer directed Mr. Thomas back to the intersection of Washington and Tucker.

**ANSWER:    Defendants deny the allegations of paragraph 162.**

163. Mr. Thomas complied. When he returned to the intersection, he encountered a large group of terrified people trying to leave the area.

**ANSWER:    Defendants deny the allegations of paragraph 163.**

164. Mr. Thomas and the rest of the group tried to leave by going east of Washington Ave.

**ANSWER:    Defendants deny the allegations of paragraph 164.**

165. They were prevented from leaving by a phalanx of bike officers.

**ANSWER:    Defendants deny the allegations of paragraph 165.**

166.    Mr. Thomas quickly attempted to secure his $6,000 camera.

**ANSWER:    Defendants deny the allegation of paragraph 166.**

167.    Soon after, Mr. Thomas was knocked to the ground. He heard his friend yell "They are pushing us."

**ANSWER: Defendants deny the allegations of paragraph 167.**

168.    Within seconds and without warning, SLMPD officers including Lt. Kiphart and Sgt. Long began to indiscriminately pepper spray the people that had

been kettled.

**ANSWER:    Defendants deny the allegations of paragraph 168.**

169.    Mr. Thomas heard no instructions.

**ANSWER:    Defendants deny the allegation of paragraph 169.**

170.    Even though Mr. Thomas was on the ground and fully complaint, and unidentified officer grabbed Mr. Thomas by his arms, dragged him, and threw Mr. Thomas to another spot in the intersection.

**ANSWER:    Defendants deny the allegations of paragraph 170.**

171.    Despite Mr. Thomas's full compliance Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee and Daut and Nicholas Lee grabbed Mr. Thomas by the arms and legs while one of them repeatedly beat Mr. Thomas in the ribs with a baton.

**ANSWER:    Defendants deny the allegations of paragraph 171.**

172.    The City identified Defendant Trenton Lee as Mr. Thomas's arresting officer.

**ANSWER:    Admit.**

173.    Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee and Daut and Nicholas Lee confiscated Mr. Thomas's camera and broke Mr. Thomas's drone.

**ANSWER:    Denied.**

174.    Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee and Daut and Nicholas Lee roughly, painfully zip tied Mr. Thomas's hands.

**ANSWER:    Defendants deny the allegations of paragraph 174.**

175.    Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee and Daut and Nicholas Lee further terrorized Mr. Thomas by carrying him by each of his limbs, across the intersection, before returning him to his feet.

**ANSWER:    Defendants deny the allegations of paragraph 175.**

176.    Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee and Daut and Nicholas Lee zip tied Mr. Thomas, he did not believe he was going to be arrested, as he had done nothing wrong. Yet Mr. Thomas spent at least 48 hours in jail.

**ANSWER:    Defendants are without sufficient information to form a belief as to the truth of the allegations in paragraph 176 and therefore deny the same.**

<u>COUNT I</u>

177.  Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:    Paragraph 177 states no allegation of fact, therefore it requires no response. To the extent a response is required, denied.**

178.  Defendant Officers knew or should have known that SLMPD officers did not have probable cause to arrest Plaintiff.

**ANSWER:    Defendants deny paragraph 178 allegations.**

179. Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee, Daut, Nicholas Lee and John Doe unreasonably seized Plaintiff, thereby depriving Plaintiff of Plaintiff's right to be free from unreasonable seizure of

Plaintiff's person in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

**ANSWER:   Defendants admit that Officer Trenton Lee is listed as Plaintiff's arresting officer. Defendants deny paragraph 179's remaining allegations.**

180.  Further, there was no objectively reasonable belief that Plaintiff had committed a criminal offense, nor was there even arguable probable cause for the arrest. As such, the seizure was unreasonable.

**ANSWER:   Defendants deny paragraph 180's allegations**

181.  Plaintiff was unreasonably seized when Defendant Officers, acting in concert, terminated Plaintiff's freedom of movement by use of kettling.

**ANSWER:   Defendants deny paragraph 169's allegations**

182.  Defendant Officers' use of kettling without providing warning to Plaintiff was an unreasonable seizure. As a direct result of the conduct of Defendants described herein, Plaintiff suffered physical injury and emotional trauma.

**ANSWER:   Defendants deny paragraph 182's allegations**

183.  Defendant Officers engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's Fourth Amendment rights.

**ANSWER:   Defendants deny paragraph 183's allegations**

184.  As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma,

great concern for Plaintiff's own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

**ANSWER:   Defendants deny paragraph 184's allegations**

185.   The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:   Defendants deny paragraph 185's allegations**

186.   At all times, Defendant Officers' were acting under color of state law.

**ANSWER:   Defendants admit paragraph 174's allegations**

187.   If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to  42 U.S.C. § 1988.

**ANSWER:   Defendants deny paragraph 187's allegations**

## COUNT II

188.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**ANSWER:   Paragraph 188 states no allegation of fact, therefore it requires no response. To the extent a response is required, denied**

189.   Plaintiff has a fundamental right to assemble and express Plaintiff's

views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

**ANSWER:   Defendants admit that all citizens have a fundamental right to speak and to assemble, subject to reasonably time, place and manner regulations; Defendants otherwise deny the conclusions of paragraph 189.**

190.   Defendant Officers' actions violated Plaintiff's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public.

**ANSWER:   Defendants deny paragraph 190's allegations.**

191.   Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

**ANSWER:   Paragraph 191 contains legal conclusions rather than allegations of fact, requiring no response. To the extent a response is required, denied.**

192.   Defendant Officers' actions violated Plaintiff's First Amendment rights to freedom of the press and freedom of speech by interfering with Plaintiff's ability to gather information and cover a matter of public interest.

**ANSWER:   Defendants deny paragraph 192's allegations.**

193.   Defendant Officers engaged in these unlawful actions willfully and

58

knowingly, acting with reckless or deliberate indifference to Plaintiff's First Amendment rights.

**ANSWER:  Defendants deny paragraph 193's allegations.**

194.  As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

**ANSWER:  Defendants deny paragraph 194's allegations.**

195.  Additionally, Defendant Officers' actions described herein have had a chilling effect on Plaintiff, who is now less likely to participate in free public discourse.

**ANSWER:  Defendants deny paragraph 195's allegations.**

196.  The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:  Defendants deny paragraph 196 allegations.**

197.  At all times, Defendant Officers were acting under color of state law.

**ANSWER:  Defendants admit paragraph 197's allegations.**

198.   If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to  42 U.S.C. § 1988.

**ANSWER:    Defendants deny paragraph 198's allegations.**

## COUNT III

*Count III, including paragraphs 199-209 has been dismissed. (See Doc. 138). To the extent a response is required, Defendants deny the factual allegations contained in those paragraphs.*

## COUNT IV

Count IV, which includes paragraphs 210-222 is asserted against the City of St. Louis only. To the extent a response is required by the individual defendants, they deny all factual allegations contained in paragraphs 210-222.

## COUNT V

223.   Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:    Paragraph 223 states no allegation of fact, therefore it requires no response. To the extent a response is required, denied**

224.    The brandishing and deployment of chemical agents for no lawful reason on September 17, 2017, by Defendants Karnowski, Aubuchon, Kiphart, Long, and unidentified Officers caused Plaintiff to experience apprehension of immediate physical injury.

**ANSWER:    Defendants deny paragraph 224's allegation**

225.  Defendant Officers' use of kettling, without warning and without a way

to egress, caused Plaintiff to experience apprehension of immediate physical injury.

**ANSWER:   Defendants deny paragraph 225's allegation**

226.     The arrest of Plaintiff by Defendant Officers, without explanation, and the placement of Plaintiff's hands in zip-cuffs purposely placed Plaintiff in apprehension of immediate physical injury.

**ANSWER:   Defendants deny paragraph 226's allegations.**

227.     As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

**ANSWER:   Defendants deny paragraph 227's allegations.**

228.     Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

**ANSWER:   Defendants deny paragraph 228's allegations.**

229.     Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with

a defined and funded self-insurance program for claims, judgments, and other related legal matters."

**ANSWER:   Defendants admit that that the passage in paragraph 229 is quoted accurately. Defendants deny all remaining allegations and conclusions presented in paragraph 229.**

230.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

**ANSWER:   Defendants deny paragraph 230's allegations.**

231.    The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:   Defendants deny paragraph 231's allegations.**

## COUNT VI

232.  Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:   Paragraph 232 states no allegation of fact, therefore it requires no response. To the extent a response is required, denied**

233.  Plaintiff was arrested without any legal justification or probable cause by Defendant Officers.

**ANSWER:**   Defendants deny paragraph 233's allegations.

234.  Defendant Officers proceeded to constrain and confine Plaintiff against Plaintiff's free will. There was no lawful justification for Defendants restraining and confining Plaintiff in the above manner.

**ANSWER:**   Defendants deny paragraph 234's allegations.

235.  As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

**ANSWER:**   Defendants deny paragraph 235's allegations.

236.  The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:**   Defendants deny paragraph 236's allegations.

**COUNT VII**

*Count VII, including paragraphs 237-241 has been dismissed. (See Doc. 138). To the extent a response is required, Defendants deny the factual allegations contained in those paragraphs.*

## COUNT VIII

*Count VII, including paragraphs 242-249 has been dismissed. (See Doc. 138). To the extent a response is required, Defendants deny the factual allegations contained in those paragraphs.*

## COUNT IX

250.  Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:   Paragraph 250 states no allegation of fact, therefore it requires no response. To the extent a response is required, denied.**

251.  By surrounding Plaintiff, assaulting Plaintiff, spraying Plaintiff in the face at point- blank range with a chemical agent, and arresting Plaintiff without probable cause, Defendant Officers committed acts that rose to the level of extreme or outrageous conduct that goes beyond the possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.

**ANSWER:   Defendants deny paragraph 251's allegations.**

252.  Defendant Officers, including but not limited to Defendants Karnowski, Aubuchon, Kiphart, and Long, began to arbitrarily and unconstitutionally pepper spray citizens who had complied with orders, causing chaos, fear and terror to Plaintiff.

**ANSWER:   Defendants deny paragraph 252's allegations.**

253.  Defendant Officers' actions were intentional.

**ANSWER:** Defendants deny paragraph 253's allegations.

254. Such actions by Defendant Officers have caused Plaintiff severe emotional distress that has resulted in bodily harm, as described above.

**ANSWER:** Defendants deny paragraph 254's allegations.

255. Defendant Officers' sole motivation was to cause emotional distress to Plaintiff and the other people Defendants unlawfully arrested.

**ANSWER:** Defendants deny paragraph 255's allegations.

256. As a direct result of the conduct of Defendant Officers described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for her own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

**ANSWER:** Defendants deny paragraph 256's allegations.

257. Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

**ANSWER:** Defendants deny paragraph 257's allegations.

258. Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with

a defined and funded self-insurance program for claims, judgments, and other related legal matters."

**ANSWER:   Defendants admit that that the passage in paragraph 258 is quoted accurately. Defendants deny all remaining allegations and conclusions presented in paragraph 258.**

259.  By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

**ANWER:   Defendants deny paragraph 259's allegations.**

260.  The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:   Defendants deny paragraph 260's allegation.**

## COUNT X

261.  Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**ANSWER:   Paragraph 261 states no allegation of fact, therefore it requires no response. To the extent a response is required, denied.**

262. Alternative to Count IX, above, by surrounding Plaintiff, assaulting Plaintiff, spraying Plaintiff with pepper spray in the face at point-blank

range, and arresting Plaintiff without probable cause, Defendant Officers realized or should have realized that their conduct posed an unreasonable risk to Plaintiff.

**ANSWER:   Defendants deny paragraph 262's allegations.**

263.   Defendant Officers knew or should have known that wearing tactical helmets, vests, shields, and batons; screaming war chants; and pounding their batons on the pavement; posed an unreasonable risk to Plaintiff by inciting extreme terror.

**ANSWER:   Defendants deny paragraph 263's allegations.**

264.   Defendant Officers, including but not limited to Defendants Karnowski, Aubuchon, and Kiphart, began to arbitrarily and unconstitutionally pepper spray citizens who had complied with orders, causing chaos, fear and terror to Plaintiff.

**ANSWER:   Defendants deny paragraph 264's allegations.**

265.   Plaintiff was reasonably in fear for his own person because of the actions of Defendant Officers and suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendants' actions.

**ANSWER:   Defendants deny paragraph 265's allegations.**

266.   As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety, fear, apprehension, depression,

anxiety, consternation and emotional distress; lost time, loss of
employment opportunity, and loss of faith in society.

**ANSWER:    Defendants deny paragraph 266's allegations.**

267.  Defendant City of St. Louis obtains insurance from the Public
Facilities Protection Corporation, a not for profit corporation into which the
City pays funds yearly. The funds are later disbursed by the corporation to
pay claims against the City.

**ANSWER:    Defendants deny paragraph 267's allegations.**

268.  Alternatively, the City's relationship with the PFPC serves as a self-
insurance plan. The 2017 Comprehensive Annual Financial Report for the
City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of
the primary government because its sole purpose is to provide the City with
a defined and funded self-insurance program for claims, judgments, and
other related legal matters."

**ANSWER:    Defendants admit that that the passage in paragraph 268 is
quoted accurately. Defendants deny all remaining allegations and conclusions
presented in paragraph 268.**

269.  By possessing such insurance or self-insurance, the City has waived
sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

**ANSWER:    Defendants deny paragraph 269's allegations.**

270.  The actions of Defendants described herein were carried out in bad
faith and with malice, done with actual, wanton intent to cause injury, and

intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:**   Defendants deny paragraph 270's allegations.

### COUNT XI

*Count XI, including paragraphs 271-275 has been dismissed. (See Doc. 138). To the extent a response is required, Defendants deny the factual allegations contained in those paragraphs.*

### COUNT XII

276.  Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:   Paragraph 276 states no allegation of fact, therefore it requires no response. To the extent a response is required, denied.**

277.  Defendants engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

**ANSWER:**   Defendants deny paragraph 277's allegations.

278.  The use of force against Plaintiff was objectively unreasonable.

**ANSWER:**   Defendants deny paragraph 278's remaining allegations.

279. Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee,

Daut, Nicholas Lee, and John Doe used excessive force by restraining Plaintiff or tying Plaintiff's hands in the zip cuffs.

**ANSWER:  Denied.**

280.  An unidentified officer used excessive force by draggin Plaintiff.

**ANSWER: Denied.**

281. Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee, Daut, Nicholas Lee, and John Doe used excessive force by beating plaintiff.

**ANSWER:  Denied.**

282.  The use of kettling, without warning, was objectively unreasonable and constituted excessive force.

**ANSWER:   This allegation has been dismissed. (Doc. 138). Otherwise denied.**

283. As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

**ANSWER:   Defendants deny paragraph 283's allegations.**

284.  The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter

them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:   Defendants deny paragraph 284's allegations.**

285.  At all times, Defendants were acting under color of state law.

**ANSWER:   Defendants admit paragraph 285's allegations**

286. If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to  42 U.S.C. § 1988.

**ANSWER:   Defendants deny paragraph 286's allegations.**

## COUNT XIII

287.    Plaintiff incorporates the preceding paragraphs of this Complaint as if set forth fully herein.

**ANSWER:   Paragraph 287 states no allegation of fact, therefore it requires no response. To the extent a response is required, denied.**

288.    To the extent that individual Defendants Officers did not participate in specific acts of excessive use of force against Plaintiff, said Defendants witnessed such conduct and failed to intervene to prevent it from occurring and/or to lessen its severity, despite having the means to do so.

**ANSWER:   Defendants deny paragraph 288's allegations.**

289.    During all events described in the Complaint, Defendant O'Toole was in the Real Time Crime Center. He was communicating with officers in the ground, was aware of and approved the plan to conduct the kettling arrest of Plaintiff and other persons. During the kettling event, Defendant

71

O'Toole was using Real Time Crime Center cameras to monitor the unlawful mass arrest and could see the excessive force being deployed on Plaintiff and other citizens. At all times, Defendant O'Toole had the ability to intervene and order the other officers to cease with the unconstitutional arrest and use of excessive force on Plaintiff and other citizens.

**ANSWER:**   **Defendants deny paragraph 289's allegations.**

290.    Defendant Officers and O'Toole knew the seizure of Plaintiff was unreasonable, without probable cause, and illegal.

**ANSWER:**   **Defendants deny paragraph 290's allegations.**

291.    Similarly, Defendant Officers and O'Toole knew the force used against Plaintiff was unreasonable under the circumstances and was clearly excessive.

**ANSWER:**   **Defendants deny paragraph 291's allegations.**

292.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

**ANSWER:**   **Defendants deny paragraph 292's allegations.**

293.    Defendant engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiff's Fourth Amendment rights.

**ANSWER:   Defendants deny paragraph 293's allegations.**

294.     The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:   Defendants deny paragraph 294's allegations.**

295.     Defendants acted under color of state law.

**ANSWER:   Defendants admit paragraph 295's allegations.**

296.     If Plaintiff prevails, he is entitled to recover attorneys fees pursuant to 42 U.S.C. § 1988.

**ANSWER:   Defendants deny paragraph 296's allegations.**


## COUNT XIV

297.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**ANSWER:   Paragraph 297 states no allegation of fact, therefore it requires no response. To the extent a response is required, denied.**

298.  During the process of being unconstitutionally arrested, Plaintiff suffered battery at the hands of Defendants Gilman, Lemons, Rodriguez, McNamara, Trenton Lee, Daut, Nicholas Lee, and John Doe caused intentional and

offensive bodily harm to Plaintiff.

**ANSWER:   Defendants deny paragraph 298's allegations.**

299.  The physically aggressive tactics of Defendants caused intentional and offensive bodily harm to Plaintiff.

**ANSWER:   Defendants deny paragraph 299's allegations.**

300.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety, fear, apprehension, depression, anxiety, consternation and emotional distress; lost time, loss of employment opportunity, and loss of faith in society.

**ANSWER:   Defendants deny paragraph 300's allegations.**

301.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

**ANSWER:   Defendants deny paragraph 301's allegations.**

302.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

**ANSWER:** Defendants admit that that the passage in paragraph 302 is quoted accurately. Defendants deny all remaining allegations and conclusions presented in paragraph 302.

303.     By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

**ANSWER:** Defendants deny paragraph 303's allegations.

304.     The actions of Defendants described herein were carried out in bad faith and with malice, done with actual, wanton intent to cause injury, and intentional and callously indifferent to the rights of Plaintiff, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:** Defendants deny paragraph 304's allegations.

## OTHER ANSWERS

1.     Defendants deny all allegations of fact contained in the un-numbered "introduction" paragraphs to Plaintiff's Fourth Amended Complaint.

2.     Defendants deny all allegations of fact contained in the "WHEREFORE" clause located after paragraph 304 of Plaintiff's Fourth Amended Complaint.

3.     Defendant request a jury trial on all issues so triable.

## AFFIRMATIVE DEFENSES

1.      Further answering, Defendant states that Plaintiff's Fourth Amended Complaint fails to state a claim upon which relief can be granted in each and every count

2.      Further answering, Defendant states that all actions of the individual Defendant officers with regard to Plaintiff were taken on the basis of probable cause or arguable probable cause to believe that Plaintiff was violating ordinances or statutes, that Defendant reasonably believed that said defendant's actions were lawful, that no act of Defendant violated any clearly established constitutional right of Plaintiff, and so the individual Defendant are immune from liability by reason of the doctrine of qualified immunity. Because the individual Defendant herein committed no constitutional tort, Defendant City of St. Louis is not liable to Plaintiff on any theory.

3.      Further answering, Defendant and each of them states that Plaintiff failed to mitigate his damages by failing to disperse as requested by officers of the law and by failing promptly to seek medical attention or treatment for claimed injuries.

4.      Further answering, Defendant states that all state law claims asserted against any defendant in an individual or official capacity are barred by official immunity or by sovereign immunity in that the individual defendant herein, in taking any actions with regard to Plaintiff were exercising discretion in the performance of official duties in preserving public order and arresting persons reasonably believed to be violating valid ordinances or statutes.

5.     Further answering, Defendant states that all state law claims asserted against any defendant in an individual or official capacity are barred because, at the time of each Plaintiff's alleged injury, each individual defendant was performing a public duty in responding to an unlawful assembly and other unlawful acts of numerous persons so as to preserve public order and the rights of the public in general.

6.     Further answering, Defendant states that liability, if any, to Plaintiff cannot be joint and several, and damages, if any, can be awarded against any defendant solely based on that individual defendant's conduct directly causing such damages.

7.     Further answering, Defendant states that any use of force by the individual defendant herein against Plaintiff was privileged because the force was used reasonably applied (a) in order to overcome unlawful resistance to or interference with an arrest, which Plaintiff knew was occurring, (b) in self-defense by the individual defendant, against whom Plaintiff used or threatened to use force to prevent defendant from arresting another person or persons, (c) in defense of third persons, namely other officers at the scene of Plaintiff's arrest, against whom Plaintiff was using or threatening the use of force, or (d) as otherwise authorized by Missouri law, including but not limited to §563.021 and §563.046, RSMo.

8.     Further answering, Defendant states that the injuries suffered by Plaintiff, if any, were of such a nature as can be remedied by existing remedies under the law of Missouri, which state law remedies are sufficient post-deprivation remedies so that Plaintiff was not and is not deprived of any liberty or property interest without due

process of law as prescribed by the Fourteenth Amendment by reason of the acts or conduct of Defendant.

9.      Further answering, Defendant states that, with respect to any negligent count asserted by Plaintiff, if Plaintiff suffered any injury by reason of any negligent action of Defendant--which Defendants deny--then and in that event fault must be apportioned to Plaintiff by reason of Plaintiff's negligence or assumption of risk in that Plaintiff chose to encounter the known risk of injury to himself arising from the alleged breach of duty by defendant.

10.     Further answering, the state law claims against Defendant City of St. Louis are barred by sovereign immunity.

11.     Defendants' use force in this case pursuant to and as described in RSMo. § 563.046 is an absolute defense to civil liability as provided in RSMo. § 563.074.1.

12.     Defendants request that this Court award attorney's fees, court costs, and all reasonable expenses incurred in defense of this civil action in his favor and against Plaintiff and her counsel pursuant to RSMo. § 563.074.2

13.     Defendants incorporates each and every additional affirmative defense that may be uncovered or made known during the investigation and discovery of this case. Defendant specifically reserves the right to amend this Answer to include additional affirmative defenses at a later time.

        WHEREFORE, having fully answered, Defendants respectfully request that this Court dismiss this case, with prejudice, and for any other such relief as this Court deems proper.

Respectfully submitted,
SHEENA HAMILTON
CITY COUNSELOR

*/s/Catherine Dierker*
Catherine Dierker 70025MO
Assistant City Counselor
dierkerc@stlouis-mo.gov
Robert H. Dierker 23671MO
dierkerr@stlouis-mo.gov
Brandon Laird, 65564 MO
lairdb@stlouis-mo.gov
Abby Duncan 67766 MO
duncana@stlouis-mo.gov
Associate City Counselors
1200 Market St.
City Hall, Rm 314
St. Louis, MO 63103
314-622-3361
Fax 314-622-4956