UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DEMETRIUS THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:18-CV-1566 |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| CITY OF ST. LOUIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### Defendants' Reply in Support of their Motion for Summary Judgment

Defendants hereby file this reply memorandum in support of their motion for summary judgment. Plaintiffs' opposition to defendants' motion for summary judgment fails to demonstrate the existence of a genuine issue of material fact precluding summary judgment in defendants' favor. On the contrary, the material facts cannot be said to be in dispute.

I. The undisputed facts demonstrate that there can be no liability against the City on a *Monell theory*

   a. The uncontroverted evidence demonstrates that the City was not deliberately indifferent in regards to its training, discipline or control of its officers.

Plaintiff attempts to forge a claim against the City for failure to train based on the lack of knowledge by most officers of a lawsuit filed against the City and fully resolved in 2015. Specifically, it is the lack of memory of the officers deposed of the settlement agreement in *Templeton v. Unified Command,* that was reached in 2015. He then argues a series of unrelated improper actions on the part of one special

operations unit demonstrate a lack of discipline or control by the City. Neither of these demonstrates the legal requirement for a claim against the City.

"[T]the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Otey v. Marshall*, 121 F.3d 1150, 1156 (8th Cir. 1997). "Policymakers continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Connick v. Thompson*, 563 U.S. 51, 62 (2011)(internal citation omitted). "A municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the police." *Giron v. City of Alexander*, Case No. 4:07-CV-00568-GTE, 2009 U.S. Dist. LEXIS 83083, *38 (E.D. Ark., Sept. 11, 2009); *citing Dunn v. City of Elgin*, 347 F.3d 641. 646 (7th Cir. 2003). Similar conduct is necessary to put the City on notice of an unconstitutional training or disciplinary program. *Perkins v. Hastings*, Case No. 4:15-CV-00310 BSM, 2017 U.S. Dist. LEXIS 217455, *8 (E.D. Ark, Mar. 24, 2017); *citing Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999), aff'd, 915 F.3d 512 (8th Cir. 2019).

After the protesting that occurred in 2014, and the subsequent settlement in the *Templeton* lawsuit, the St. Louis Police Department has engaged a multitude of resources to add training and education to its existing protest response. (SOF ¶¶ 10-14). They also created a new Bicycle Response Team to assist with responding to

2

large scale protesting. (SOF ¶¶ 23-24). After the *Templeton* agreement was entered into, the SLPD sent a notification to all of its employees regarding the requirements of the agreement. (SOF ¶15) Although Lt. Aubuchon, and most of the BRT members on scene at the time of this incident were not members of the CDT team, the fact that such wide-ranging efforts were undertaken to address the SLPD's response to civil disobedience demonstrates that there was no conscious disregard for the rights of protestors on the part of the City of St. Louis. (*See Connick v. Thompson*, 563 U.S. at 61).

Further, as Plaintiff has conceded, the City changed the Special Order regarding the Use of Force to conform to the requirements of the agreement[1]. (Pl. SOF ¶ 135). In addition, the SLPD each month requires its officers to review the use of force policy and sign electronically that they have done so. (SOF ¶ 18) Much of Plaintiff's theory rests on the testimony of several officers who have little or no memory of the *Templeton* settlement agreement. (Pl. SOF ¶¶ 130-137). But that is based almost entirely on questions that were asked more than five years after the settlement was entered. Plaintiff may believe that the training programs and additional units are left wanting, but they miss the point. This is a role that appellate courts have expressly denied is proper for a district court to take. *See Ahmad v. City of St. Louis,* 995 F.3d 635, 642-43 (8th Cir. 2021) *citing Chicago United Ind. v. City*

---

[1] The *Templeton* final settlement agreement provided that the Court would retain jurisdiction to enforce the terms of the agreement through January 1, 2018 (Pl. Ex. 14, p. 6). However, upon reviewing the public docket of that case, no party filed any document stating that any party was not in compliance of the order.

*of Chicago*, 445 F.3d. 940 (7th Cir. 2006.)(stating that it is not the role of the Courts to micromanage a local police department.) Additionally, Plaintiff's reliance on the preliminary injunction order in *Ahmad* is error; the Eighth Circuit has stated that the evidence adduced at the preliminary injunction hearing would not suffice to grant permanent relief. *Ahmad v. City of St. Louis*, 995 F.3d 635, 641 (8th Cir 2021). That the City has undertaken, as a municipality, such wide-ranging efforts to address the response to protests demonstrates that there is a very conscious regard for the rights of citizens and that a failure to train claim must be dismissed.

Plaintiff's response shows that a failure to discipline claim must also be dismissed. To make a case for municipal liability under § 1983 for failure to supervise, Plaintiffs must demonstrate that a supervisor "demonstrated deliberate indifference or tacit authorization of the offensive acts." *Brockington v. City of Sherwood*, 503 F.3d 667, 673 (8th Cir. 2007)(internal quotations omitted). Although it can be a distinct claim from failure to train, a failure to supervise claim is analyzed the same. *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998).

Plaintiff has not provided any evidence of events that are similar in nature to the actions alleged against the defendant officers. "A pattern of prior similar misconduct is necessary because…an officer who misses a court date or an officer who punches someone under questionable circumstances … does not logically cause an officer to believe he could shoot and kill someone in violation of the Constitution without fear of punishment." *Perkins v. Hastings*, Case No. 4:15-CV-00310 BSM, 2017 U.S. Dist. LEXIS 217455, *8 (E.D. Ark, Mar. 24, 2017. "[A] showing at trial of a

relatively few instances of violations by individual police officers, without any showing of a deliberate policy on behalf of [the City, would] not provide a basis for equitable relief." *Ahmad v. City of St. Louis*, 995 F.3d at 642. For example, Plaintiff points to the testimony of Sarah Molina at an event in Fountain Park as a "similar" instance of misconduct. (Pl. SOF ¶¶120-124) However, the facts of that case revolve around the use of canisters tear gas and other launched munitions, not pepper spray while making an arrest. (*Id*) Taking Plaintiff at his word that the event could be misconduct, this event would not cause a member of a CDT arrest team to believe, as Plaintiff alleges, beat an arrestee with a baton without fear of punishment. *See Perkins v. Hastings, supra.*

        b.    **There is no evidence that supports a claim that the City has a pattern or practice of using excessive force or making unlawful arrests on protestors.**

There is no evidence that a custom or practice caused any constitutional deprivation. *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). A city may be subject to § 1983 liability for a custom only if it had a policy or custom of failing to act upon prior similar complaints of unconstitutional conduct. *Andrews v. Fowler*, 98 F.3d 1069, 1074-75 (8th Cir. 1996) (emphasis added). There must exist a prior pattern of unconstitutional conduct that is so "persistent and widespread" as to have the effect and force of law. *Id.* at 1075. The Seventh Circuit aptly observed that "[t]he word 'custom' generally implies a habitual practice or a course of action that characteristically is repeated under like circumstances." *Jones v. Chicago*, 787 F.2d 200, 204 (7th Cir.1986). The analysis above demonstrates that there are no sufficiently

5

similar complaints that can possibly show a custom that has the force and effect of law. Certainly, there is no custom that can show an affirmative link to the events that occurred. Once again, the only similarity that can be shown in *any* of the events Plaintiff points to is that they took place during protests. There are no other facts asserted that suggest the circumstances, who deployed munitions, or what munitions were deployed. (PL SOF ¶¶ 118, 120-124) The Supreme Court itself has stated that general violations, even those that stem from facially similar issues, are not sufficient to demonstrate a *Monell* claim; rather the violation in question has to be *specific.* *Connick v. Thompson*, 563 U.S. 51, 60 (2011). In *Connick,* the Court found that there was no *Monell* liability based on general violations of the *Brady* rule because the violations alleged in Connick were different from the *Brady* violations alleged in previously by the Defendant. *Id.* at 62. ("Those four reversals could not have put Connick on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here.") Even if those prior incidents that did occur in a protest, they don't specify any other circumstances, such as who deployed the munitions, when they were deployed, what kind of munitions or how they were deployed. (SOF ¶¶ 118, 120-24.) For example, a launchable munition from an armored vehicle is very different, and would require different training deploying pepper spray from a hand-held canister during an arrest. *See Connick v. Thompson*, 563 U.S. at 60.

    II.    **Qualified immunity bars the claims against the individual defendants.**

        a.    **There was at least arguable probable cause to order the arrest of those who did not comply with the dispersal orders**

Plaintiff's argument as it relates to his arrest claim is that he did not commit any crimes, nor did any officer who was involved in his arrest witness him commit any crimes. However, this misses the point. The decision to makes arrests, of those who did not comply with dispersal orders was based on at least arguable probable cause. Just a few hours earlier, in the same night, at a nearby location, there had been unquestionable violence and property damage. (Pl. SOF ¶¶ 44-47)¶ Believing that the instigators of that destruction had been apprehended, the SLPD sent the CDT back to the staging area and out of downtown. (SOF ¶ 47)

It was then that reports made their way to Col. Leyshock that groups were beginning to reform at multiple locations downtown. (SOF ¶¶48-54) The reports of the crowd continued to increase in both size and intensity. (SOF ¶¶ 48-54) BRT officers met one of the groups at Locust and Tucker. (SOF ¶¶49-50) Reports then came in that the group, which had grown in size, was engaging with the BRT. (SOF ¶ 47) Lt. Boyher requested that a car arrive to give dispersal orders.

To learn more information about what was going on, Col. Leyshock asked Maj. Howard to call him. (SOF ¶¶ 53-54) Maj. Howard had taken a group of non-CDT officers downtown because the SLPD believed the protesting to be over for the evening. (SOF ¶45-46).  He heard about something happening around Locust and 11th street. Upon arriving, Maj. Howard saw the crowd and an item was immediately thrown in his direction. (SOF ¶ 51) At Col. Leyshock's direction, he relayed that information on a phone call, and relayed that he did not believe that the crowd would disperse. (SOF ¶¶ 53-54).

7

It was only at this point that that Lt. Col. Leyshock ordered the CDT back downtown and for Sgt. Rossomanno to begin giving dispersal orders. (SOF ¶ 55). Lt. Col. Leyshock was also aware of the nature of the protests earlier that weekend. (SOF ¶¶ 35- 43) Sgt. Rossomanno had recently arrived at Locust and Tucker. He surveyed the scene and agreed that dispersal orders needed to be given. He began to give dispersal orders, no fewer than three of them were given. Each of those orders gave those in the area two different routes of egress- west on Locust or north on Tucker. (PL. SOF ¶¶ 56; 58)

Plaintiff's contention those who were in the area complied with the dispersal orders is belied by the video. The group did move from one part of Locust, west until he reached Tucker. However, once they were at Tucker, they failed to follow any other commands. At least two additional dispersal orders can be heard on the video taken by the protestors.

"For a dispersal order to be meaningful, officers generally must give time for a dispersal order to be heeded before the use of force." *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 267 (S.D. Ohio 2021). Here, it is undisputed that multiple dispersal orders were given 30 minutes prior to the time that the intersection was closed off. Further, the intersection was free for those looking to leave until just before the intersection was closed off. Plaintiff states that he, along with several others all walked north on Tucker and stopped at Washington and Tucker, but most did not move to any other location. (PL. SOF ¶¶ 15-16 ). Another protestor, Christopher Robertson, took a video on which the dispersal orders can be heard.

8

Rather than rather than leave, he states that he is going to find another group of protestors. (Exhibit Y) Indeed, the City's dispersal orders provided two routes of egress. (PL SOF ¶ 59) But the idea of a dispersal order is to give routes to *disperse.* The very word disperse means "to separate and move apart in different directions without order or regularity; become scattered." Dictionary.com, https://www.dictionary.com/browse/disperse (2022). The idea of a dispersal order is to scatter the crowd, but to make sure that the crowd knows the directions in which they can travel to so scatter. The undisputed facts are that the Plaintiff walked with others north on Tucker and then stayed on Washington. That is not dispersing. So, after multiple orders, there were a large group of people, including Plaintiff, who did not comply with an order to disperse.

      Once again, Plaintiff relies heavily on the Templeton injunction as means of demonstrating that there was no probable cause. This injunction does not prevent defendants or other law enforcement agencies from using all lawful means to control crowds and protect against violence. Missouri's refusal-to-disperse law is not restricted by this injunction. Where there is an unlawful assembly or riot, the police can order persons to disperse and can arrest those who do not. If a crowd is becoming unruly, the police may find it necessary to order the crowd to disperse— including persons who are not committing crimes or violent acts—and the police may also tell an unruly crowd to move to a different place. From time to time this may mean that citizens who are themselves peaceful but who are part of a crowd that is becoming violent must obey these orders or face arrest. This injunction

9

merely prohibits that kind of directive to peaceful citizens who are committing no crimes, whether they are doing so singly or in a law-abiding group. So there was at least arguable probable cause to arrest everyone at the intersection that night, and those claims should be dismissed as they are barred by qualified immunity.

      b.      **Qualified immunity bars the claims against the officers because there for excessive force.**

The Supreme Court has repeatedly stressed that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) citing *Graham v. Connor*, 490 U. S. 386, 396 (1989). The undisputed facts here show the only force that has been alleged was by Officers on the arrest team as arrested Plaintiff. (PL SOF¶¶ 21-22) The only officer identified who was present for that incident was Officer Lee. (SOF ¶ 23). No other officer has been identified as having used any force on the plaintiff. This Court has already dismissed the claims related to the zip cuffs being too tight. (Doc. 142) It is undisputed that Col. O'Toole, Lt. Col. Leyshock, Maj. Howard, Lt. Kiphart, Sgts. Rossomanno, Jemerson, Karnowski and Long did not use any force on Thomas at all. So, for the reasons outlined in the memorandum in support, they should be granted summary judgment on the use of force claims as well. At best, Sgt. Gilman, Officers Lemons, Rodriguez, McNamara, Trenton Lee, Nicholas Lee and Daut only used the force necessary to detain and arrest Thomas. It is clear on the video that Thomas is struggling with the officers, so using some force to get him to comply is not unreasonable. At the very least, it is not clearly established that the officers

could not so use force to get a non-compliant arrestee to stop struggling once he had been placed under arrest during a chaotic and fast moving protest. So qualified immunity should be granted in favor of those defendants.

### III. Plaintiff has produced no evidence that overcomes official immunity on the state law claims.

Plaintiffs' response does not dispute that the actions of the individual defendants were discretionary. Rather, plaintiffs attempt to escape official immunity by claiming that the actions were taken in bad faith or with malice. Plaintiffs do this, even at summary judgment, through purely conclusory allegations. "A finding of malice requires 'conduct which is so reckless or wantonly and willfully in disregard of one's rights that a trier of fact could infer from such conduct bad faith or any improper or wrongful motive." *Wealot v. Brooks*, 865 F.3d 1119, 1129 (8th Cir. 2017) (citing *Twiehaus*, 706 S.W.2d at 447). "Acting with malice requires an 'actual intent to cause injury.'" *Id.* "A finding of bad faith embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, [or] breach of a known duty through some ulterior motive." *Id.* There is no such evidence in this case to show that any officer acted with any ulterior motive. So official immunity should bar the state law claims against the individuals.

### IV. Plaintiff's do not oppose the defendant's claims that sovereign immunity bars the state law claims against the City

Though Plaintiff controverts several of the facts relating to the PFPC and the self-insurance ordinance, nothing in his response in opposition to summary judgment references the City's argument that the state law claims are barred by

sovereign immunity. So, the only conclusion to be drawn is that Plaintiff does has no opposition. This is the prudent, as the clear weight of authority and the facts do not support a claim that sovereign immunity has been waived. The only argument the City wishes to add to its memorandum in support is that the Eighth Circuit has found that the PFPC does not create a waiver of sovereign immunity. *See Torres v. City of St. Louis, et al,* 39 F.4th 494, 510 (8th Cir. 2022). So summary judgment should be granted in favor or the City on the state law claims.

## Conclusion

For the reasons stated above and in their motion for summary judgment, Defendants City of St. Louis, and Defendants Col. O'Toole, Lt. Col. Leyshock, Lt. Sachs, Lt .Howard, Lt. Aubuchon, Lt. Kiphart, Sgts. Rossomanno, Jemerson, and Karnowski, Officers Gilman; Officers Trenton Lee, Nicholas Lee, Bryan Lemons, Joseph Rodriguez, Timothy McNamara, and Patrick Daut, respectfully request that this Court enter an order granting summary judgment in their favor, and for any other relief as this Court deems just and proper.

Respectfully submitted,

SHEENA HAMILTON
CITY COUNSELOR

*/s/ Brandon Laird*
Brandon Laird  65564 MO
Associate City Counselor
lairdb@stlouis-mo.gov
Abby Duncan 67766 MO
Associate City Counselor
duncana@stlouis-mo.gov
Adriano Martinez 69214
Assistant City Counselor
martineza@stlouis-mo.gov
1200 Market St.
City Hall, Rm 314
St. Louis, MO 63103
314-622-3361
Fax 314-622-4956